## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **AFFIDAVIT IN SUPPORT OF** | ) |
| **CRIMINAL COMPLAINT FOR** | ) |
| **ARREST WARRANTS FOR:** | ) **FILED UNDER SEAL** |
| | ) |
| **(1)    Denzel CHISHOLM a/k/a** | ) |
| **"Den," a/k/a "Din";** | ) |
| | ) **Case No. 16-MJ-5114-JGD** |
| **(2)    CHRISTOPHER WILKINS,** | ) |
| **a/k/a "Degree" and "Half Circle";** | ) |
| | ) |
| **(3)    TYRONE GOMES;** | ) |
| **(4)    EELYESE MATEO, a/k/a "El** | ) |
| **Chapo";** | ) |
| **(5)    BETHANNE HUTCHINGS;** | ) |
| **(6)    OLIVER HAMILTON;** | ) |
| **(7)    STEPHANIE DAVIS;** | ) |
| **(8)    ANTHONY HALL a/k/a** | ) |
| **"Nova";** | ) |
| **(9)    BROOKE COTELL;** | ) |
| **(10)   SHAUN MILLER a/k/a** | ) |
| **"Shizz" and "Shizz Miller";** | ) |
| **(11)   BENJAMIN RODERICK;** | ) |
| **and,** | |
| **(12)   JASON MELLO.** | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**A.    Introduction**

1.    I, John H. Hayes, Senior Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, being duly sworn, state as follows in support of my application in support a criminal complaint for arrest warrants for the following individuals:

   a.    Denzel CHISHOLM a/k/a "Den," a/k/a "Din";

   b.    CHRISTOPHER WILKINS, a/k/a "Degree" and "Half Circle";

   c.    TYRONE GOMES;

   d.    EELYESE MATEO, a/k/a "El Chapo";

   e.    BETHANNE HUTCHINGS;

   f.    OLIVER HAMILTON;

   g.    STEPHANIE DAVIS;

   h.    ANTHONY HALL a/k/a "Nova";

   i.    BROOKE COTELL;

   j.    SHAUN MILLER a/k/a "Shizz" and "Shizz Miller";

   k.    BENJAMIN RODERICK; and,

   l.    Jason MELLO.

2.    Pursuant to this affidavit and criminal complaint, I made applying to charge Defendants CHISHOLM, WILKINS, GOMES, MATEO, HUTCHINGS, HAMILTON, DAVIS and HALL with conspiracy to distribute and possess with the intent to distribute a mixture and substance containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 846.  I am applying to charge COTELL and MILLER with possession of heroin with the

2

intent to distribute said heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).  Finally, I am applying to charge defendants WILKINS and RODERICK with conspiracy to possess a firearm in furtherance of a drug trafficking offense, in violation of Title 18, United States Code, Section 924(o).

3.      I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

4.      I have been employed as an ATF Special Agent since January of 2000.  Prior to that, I was employed as an Intelligence Research Specialist with the United States Drug Enforcement Administration ("DEA") for approximately one and a half years, where I received training in narcotics trafficking, interdiction, and asset forfeiture investigations.  I am currently assigned to the ATF Field Office in Bridgewater, Massachusetts with investigative responsibilities for areas south of Boston, including Cape Cod.

5.      Prior to this assignment, I was assigned for three years to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including ATF, the DEA, the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.  I am a graduate of the ATF National Academy and the Criminal Investigator School located at the Federal Law Enforcement Training Center in Glynco, Georgia.

6.      Since becoming a Special Agent with the ATF, I have conducted numerous

investigations concerning unlawful drug possession, importation and distribution in violation of

Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952, 960 and 963, as well as the

unlawful possession and use of firearms in furtherance of drug trafficking and crimes of violence

in violation of Title 18, United States Code, Sections 924 (c), 1951, and 1959.  I have extensive

experience reviewing intercepted and recorded conversations between target subjects, amongst

others.  I also have participated in physical surveillance, the introduction of undercover agents,

the execution of search warrants, debriefings of defendants, informants and witnesses, and the

review of telephone, financial, and drug records.  Through my training and experience, I have

become familiar with the manner in which illegal drugs are imported, transported, stored, and

distributed, and the methods of payment for such drugs.  I have also become familiar with the

manner in which narcotics organizations utilize various forms of violence and intimidation in

furtherance of their narcotics trafficking activity to protect their operations, members, narcotics,

and narcotics proceeds.

**B.      Introduction to the CHISHOLM DTO**

       **1.      Case background and Overview**

7.      I am currently participating in the investigation of the Denzel CHISHOLM drug

trafficking organization (hereinafter "CHISHOLM DTO" or "DTO"), which is also known as the

NAUTI-BLOCK street gang (hereinafter "GANG"), named after the area in which many

members of the gang were raised.  This large-scale criminal organization distributes fentanyl,

heroin and cocaine, to drug dealers and drug users.  Additionally, the CHISHOLM DTO/GANG

relies upon the possession and use of firearms to further their drug trafficking activities and to collect significant proceeds from their criminal activities.

8.     This investigation of the CHISHOLM DTO/GANG is being conducted by ATF and DEA agents and Task Force Officers, as well as by members of the Barnstable Police Department ("BPD") and Massachusetts State Police ("MSP") to address the rising opiate problem in Massachusetts generally, and on Cape Cod in particular.   I know from my review of Massachusetts Department of Public Statistics that in Massachusetts in 2014, an average of four people died each day from an opiod overdose.  The towns of Barnstable, Bourne and Dennis (all on Cape Cod) were particularly hard hit, with Dennis ranking fourth in the state in per capita opiate deaths in 2014.  Barnstable and Bristol counties (New Bedford) each have an opiod overdose death rate of 16.3 to 20.2 per 100,000 people, which is the highest in Massachusetts and which far exceeds the national average.

9.     With that said, I know from my discussions with state investigators, my review of wire and electronic surveillance and interceptions, and seizures of heroin associated with this case, that the CHISHOLM DTO is responsible for a significant portion of the heroin that is distributed on Cape Cod.   As described below, CHISHOLM and WILKINS appear to pool money together and purchase heroin from a common source, which they then distribute to their customers, who include Oliver HAMILTON, Brooke COTELL, Shaun MILLER, Tyrone GOMES, Stephanie DAVIS, Anthony HALL and Benjamin RODERICK.  However, to avoid law enforcement detection, the CHISHOLM DTO has involved numerous other persons in their drug distribution organization, and these people rent cars for members of the DTO, open bank

5

accounts for members of the DTO, purchase airline tickets for the DTO, and perhaps most importantly, provide residences at which the DTO members store their heroin and other narcotics.  As examples, Eelyese MATEO, a girlfriend of CHISHOLM, stores heroin at her home on CHISHOLM's behalf, and she also delivers heroin to CHISHOLM's customers. Bethanne HUTCHINGS, who lives at 43 Erin Lane in Hyannis, allows DTO members to store heroin at her home and sell heroin out of her home, and she does this, investigators believe, in exchange for heroin for personal use.

10.     The Government's evidence has come from a variety of sources, including: debriefings with cooperating individuals, controlled purchases of heroin from CHISHOLM, WILKINS and multiple other individuals, tracking and search warrants previously executed, regular surveillance of targets and target locations, pole cameras, and car stops.  In addition, since mid-October, 2015 investigators have been intercepting the wire and electronic communications of members of the CHISHOLM DTO, as authorized by District Judges F. Dennis Saylor IV and Denise J. Casper.  *See* 15-MC-91335-FDS.

**2.     Wire and electronic interceptions commenced on October 19, 2015 and are continuing.**

11.     Pursuant to authorizations from Judges Saylor and Casper of the District of Massachusetts, investigators have, between October and March, 2016, intercepted 17 telephones used by members and associates of the CHISHOLM DTO.  By a finding of probable cause, Judges Saylor and Casper found that the persons set forth in those wiretap affidavits were using the telephones described in those affidavits, and further, that the telephones were being used in

furtherance of narcotics trafficking, amongst other crimes.  These findings are incorporated herein.

12.     Investigators first began intercepting telephone 774-451-3598 (TARGET TELEPHONE 1) on October 19, 2015.  At that time, TARGET TELEPHONE 1 was used by a low-level CHISHOLM DTO member referred to herein as co-conspirator 1 ("CC-1").[1] Interceptions over TARGET TELEPHONE 1 ceased on November 12, 2015.   Based on my interception of the calls and text messages, when coupled with surveillance, interceptions over TARGET TELEPHONE 1 demonstrated that CC-1 was being supplied small quantities of heroin for distribution by another member of the DTO ("CC-2").

13.     On November 6, 2015, investigators began interceptions of TARGET TELEPHONE 2 (774-451-3598), as used by CC-2.  These interceptions continued until November 20, 2015.  During these interceptions, investigators learned that CC-2 was coordinating distribution of heroin and other narcotics in the Hyannis area of Cape Cod with his co-conspirator Denzel CHISHOLM.  CC-2 stopped using TARGET TELEPHONE 2 in mid-November, 2015 and switched to using TARGET TELEPHONE 4.  Investigators commenced interceptions of 774-244-9599 (TARGET TELEPHONE 4) on December 10, 2015.

14.     On December 1, 2015, investigators began interceptions of TARGET TELEPHONE 3 (774-521-5200), as used by Denzel CHISHOLM.  These interceptions showed that Denzel CHISHOLM was bulk heroin for redistribution from New Bedford, MA.  Further,

---

[1] A number of co-conspirators of CHISHOLM have been identified during this investigation and identified by name in the accompanying wiretap affidavits.  These co-conspirators are not being charged in this complaint at this time, and hence, are referred to as "co-conspirator" or "CC-x".

before intercepting CHISHOLM's TARGET TELEPHONE 3, investigators had seized heroin

from Brooke COTELL and Shaun MILLER, who, as described below, had just purchased this

heroin from CHISHOLM.

15.     On January 12, 2016, investigators commenced interceptions of CHISHOLM's

508-375-5610 (TARGET TELEPHONE 5), WILKINS' TARGET TELEPHONES 6 (508-207-

0756) and 7 (508-566-0282), and CC-2's TARGET TELEPHONE 8 (508-815-6693).

CHISHOLM soon stopped using TARGET TELEPHONE 5, and on January 29, 2016,

investigators commenced interceptions of CHISHOLM's 508-375-5694 (TARGET

TELEPHONE 9).  Interceptions of CHISHOLM's TARGET TELEPHONE 9 have shown that

CHISHOLM continued to distribute large amounts of heroin to persons such as Tyrone GOMES

and others, while interceptions of WILKINS' TARGET TELEPHONES 6 and 7 have shown that

WILKINS was primarily distributing heroin to small and mid-size drug dealers on Cape Cod.

Finally, interceptions of CC-2's TARGET TELEPHONE 8 showed that CC-2 primarily assisted

with obtaining bulk heroin for distribution from places such as New Bedford.

16.     On February 26, 2016, investigators commenced interceptions of TARGET

TELEPHONES 10 through 15, and continued the interceptions of CHISHOLM's TARGET

TELEPHONE 9.  TARGET TELEPHONE 10 (774-260-7143) was used by Christopher

WILKINS, TARGET TELEPHONE 11 (508-280-5343) was used by Jason MELLO, TARGET

TELEPHONE 12 (508-524-9358) was used by Tyrone GOMES, TARGET TELEPHONE 13

(774-297-3661 was used by co-conspirator 4 ("CC-4"), TARGET TELEPHONE 14 (508-375-

5855) was another phone used by CHISHOLM, and TARGET TELEPHONE 15 (832-412-5625)

was a phone used by CC-2.  These interceptions have confirmed investigators' beliefs and have

shown that CHISHOLM, CC-2 and WILKINS continue to traffic in heroin and coordinate the

trafficking of said heroin, and that they supply heroin to persons such as MELLO, Stephanie

DAVIS and CC-4.  Finally, on March 23, 2016, investigators commenced interceptions of two

additional telephones used by CHISHOLM (TARGET TELEPHONE 16; 508-375-5417 and

TARGET TELEPHONE 17: 307-757-8236), and continue interceptions of MELLO's TARGET

TELEPHONE 11.  These interceptions are continuing.

### 3. Overview of the defendants set forth in this affidavit.

17.     The following is a brief overview of each of the persons involved in the

CHISHOLM DTO as is relevant for the purpose of this criminal complaint:

a.     Denzel CHISHOLM, a.k.a. Din or Den, born in 1990, lives in West Yarmouth,

MA.  Based on my knowledge of this investigation, I believe that CHISHOLM is a leader of the

CHISHOLM DTO/GANG, and he pools money together with Christopher WILKINS and others

to purchase heroin from a common source.  CHISHOLM is a wholesale distributor of heroin and

cocaine for the CHISHOLM DTO/GANG, and he obtains kilograms of narcotics from New

Bedford and other places for distribution in the areas surrounding Hyannis, Massachusetts.[2]

Investigators are currently intercepting CHISHOLM's TARGET TELEPHONE 17.

---

2 CHISHOLM has a lengthy criminal history that extends back to 2004, when he was a juvenile.  As a juvenile,
Chisholm was arrested for vandalism, assault, intimidation and larceny amongst other crimes.  As an adult,
CHISHOLM was, most notably, convicted on March 29, 2010 of Trafficking in a Controlled Substance
(Oxycodone), Conspiracy to Violate the Controlled Substance Act, and Possession of a Firearm without a Permit.
For these crimes, CHISHOLM was sentenced to an aggregate sentence of 5 to 7 years in state prison.  Chisholm was
released from prison in the summer of 2014.

Investigators conducted multiple controlled purchases of heroin from CHISHOLM in amounts up to 200 grams in February and March of 2016.

b.      Christopher WILKINS, a.k.a. Degree, born in 1987, lives in Hyannis, MA. WILKINS is a member of the CHISHOLM DTO/GANG and, as stated above, WILKINS obtains heroin together with CHISHOLM from a common source.  Investigators have conducted numerous controlled purchases of heroin from WILKINS over the course of this investigation, and have also intercepted three telephones used by WILKINS.  These interceptions enabled investigators to hear WILKINS engage in constant drug dealing – primarily heroin but also cocaine – by WILKINS.  From these interceptions and controlled purchases, investigators believe that WILKINS distributes both street-level (user) quantities of heroin and cocaine as well as larger quantities to other drug dealers.[3]

c.      Tyrone GOMES, born in 1985, was, until his arrest as part of this case, a drug dealer within the Barnstable and Hyannis area of Cape Cod.  GOMES is supplied heroin by CHISHOLM and others.  Investigators intercepted GOMES' TARGET TELEPHONE 12, and these interceptions revealed that GOMES used his phone to distribute heroin and cocaine on a near daily basis.  GOMES was recently arrested after investigators heard him negotiate a

---

3 WILKINS has a lengthy criminal history that extends back to 2001, when he was a juvenile.  As a juvenile, WILKINS was arrested for vandalism, breaking & entering, and larceny.  WILKINS currently has Distribution of Class A Controlled Substance, Assault to Kill, Armed Assault, and Assault & Battery with a Dangerous Weapon charges pending in Barnstable Superior Court. On June 27, 2008, WILKINS was charged in Barnstable Superior Court with Breaking & Entering, Assault with Dangerous Weapon, and Assault & Battery with Dangerous Weapon. On September 8, 2009, WILKINS was convicted and sentenced to 2 ½ years (suspended sentence).  On August 4, 2006, WILKINS was charged in Barnstable District Court with Carrying a Dangerous Weapon.  On December 22, 2006, WILKINS was convicted and sentenced to one year in jail.  On October 30, 2006, WILKINS was charged in Barnstable District Court with Unarmed Robbery.  On December 12, 2006, WILKINS was convicted and sentenced to one year in jail.

purchase of heroin from CHISHOLM.  After a car stop, heroin was recovered from GOMES'

naval incident to arrest, thereby confirming that the conversations between CHISHOLM and

GOMES were, in fact, about heroin.

      d.      Eelyese MATEO, born in 1996, stores heroin for CHISHOLM at 62 Beth Lane in

Hyannis, MA, and she also delivers this heroin to CHISHOLM and his customers for further

distribution.

      e.      Bethanne HUTCHINGS, born in 1966, lives at 43 Erin Lane in Hyannis, MA.

HUTCHINGS has previous arrests for operating recklessly, leaving the scene of an accident,

assault and battery, operating under the influence of alcohol, and larceny by check.  As set forth

below, members of the CHISHOLM DTO use 43 Erin Lane as drug stash house.  On March 12,

2016, HUTCHINGS suffered a non-fatal heroin overdose at 43 Erin Lane.  Wire interceptions of

conversations between HUTCHINGS and CHISHOLM revealed that the heroin that caused this

overdose had been distributed to her by CHISHOLM, who had left this heroin with

HUTCHINGS as part of a "new batch" for HUTCHINGS to sample.

      f.      STEPHANIE DAVIS, born in 1995, lives in Harwich, MA.  Investigators believe

that DAVIS is a mid to low-level heroin dealer on Cape Cod.  Throughout this investigation,

investigators have intercepted DAVIS (as confirmed by regular surveillance) on dozens of

occasions ordering heroin from WILKINS.  As an example, on January 29, 2016, there was an

incoming text message from DAVIS to WILKINS which stated, "I work till 5 tonight, then I was

wonderin if youd be around cuz I got most of that stuff off, so I'm trying to get another finger."

Based on my training and experience, a "finger" refers to ten grams of heroin.  Further, from this

telephone call, I believe that DAVIS had already sold heroin that had been supplied to her earlier, and that she needed more heroin from WILKINS.  DAVIS has been intercepted repeatedly on CHISHOLM's and WILKINS' telephones buying both cocaine and heroin from them for re-distribution as well as, investigators believe, personal use.

g.     Benjamin RODERICK, born in 1996, lives in Hyannis, MA 02601.  On February 28, 2014, RODERICK was arrested for possession with the intent to distribute a Class D controlled substance.  Investigators believe from wire and electronic interceptions that WILKINS supplies RODERICK with narcotics for distribution, and on March 7, 2016, investigators intercepted telephone calls and text messages in which RODERICK was planning to supply WILKINS with a firearm in exchange for approximately 10 grams of heroin.  That same day, investigators seized the firearm and arrested RODERICK before he could provide this firearm to WILKINS.

h.     Jason MELLO, born in 1988, lives in Hyannis, MA.  MELLO currently uses TARGET TELEPHONE 11, and investigators have intercepted MELLO on the telephone purchasing and selling drugs to WILKINS and also purchasing heroin from CHISHOLM.  MELLOS is currently on probation stemming from a 2014 conviction for possession of a controlled substance with the intent to distribute.

i.     ANTHONY HALL, born in 1985, lives in Sandwich, MA.  On October 29, 2015, HALL was arrested for possession with the intent to distribute Class A and B controlled substances.  In addition, in April 2014, HALL was arrested for larceny and receipt of stolen property, and in 2010, HALL was arrested and convicted of assault and battery, which resulted in

a state prison sentence.  Interceptions over WILKINS' telephone have shown that WILKINS has recently supplied heroin to HALL for further distribution.  On March 11, 2016, investigators stopped a customer of HALL's after watching a hand-to-hand drug transaction between HALL and the customer; this customer had 5 grams of heroin in his possession, and he told investigators that HALL had sold him this heroin.

       j.      Brooke COTELL, born in 1994, lives in Hyannis, Massachusetts.  As set forth below, COTELL, accompanied by Shaun MILLER, purchased 100 grams of heroin from Denzel CHISHOLM on November 16, 2015.  A search of COTELL's cellular telephone subsequent to her arrest revealed that COTELL was a regular heroin customer of CHISHOLM, and that she (and MILLER) arranged to purchase narcotics from CHISHOLM by both sending text messages to CHISHOLM and making telephone calls.

       k.      Shaun MILLER, born in 1985, lives in Hyannis, Massachusetts.  As explained above, MILLER and COTELL purchased 100 grams of heroin from CHISHOLM on November 16, 2015, and they attempted to dispose of this heroin when they were pursued by the police.

### C.      **Purpose of the Affidavit**

      18.      I have personally participated in the investigation of the individuals named in this Affidavit since the fall of 2014.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of telephone and other records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agencies, including the Barnstable

Massachusetts Police Department (BPD); and (d) my experience and training as a criminal investigator.

19.     I submit this affidavit in support of a criminal complaint for the aforementioned defendants.  Because this affidavit is being submitted for the limited purpose of showing probable cause to arrest the abovementioned defendants on the federal criminal charges set forth above, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested arrest warrants for violations of federal narcotics and money laundering offenses.  Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested warrants.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

**D.      Denzel CHISHOLM is a large-scale heroin distributor in Barnstable who provides heroin to numerous other drug dealers.**

20.     The investigation into the CHISHOLM DTO has shown that CHISHOLM engages in the distribution of heroin (and other narcotics) on a near constant basis in Barnstable and Bristol counties in the District of Massachusetts.  As set forth below, CHISHOLM distributes narcotics (primarily heroin) to a number of other drug dealers, including Brooke COTELL, Shaun MILLER, Tyrone GOMES and Oliver HAMILTON.  In addition, this investigation has revealed that WILKINS and CHISHOLM pool together money to purchase heroin, and they distribute heroin to their individual customers from a common "stash" or "pot" of heroin.

1.     **On November 16, 2015, investigators seized heroin from COTELL and MILLER, and this heroin had been provided to them by CHISHOLM.**

21.     On November 16, 2015, investigators conducting surveillance watched as CHISHOLM appeared to distribute drugs to Brooke COTELL and Shaun MILLER in a transaction conducted at the "Founder's Court" apartment complex in Hyannis, located at 979 Falmouth Road.  Shortly thereafter, investigators stopped the car being driven by COTELL (with MILLER as a passenger), and found MILLER attempting to destroy a brown powder that later tested positive for heroin.  Text messages between COTELL and CHISHOLM and COTELL and MILLER showed that this heroin came from CHISHOLM.

22.     On November 16, 2015, a pen register revealed that CHISHOLM and COTELL were in heavy contact with one another in the early evening.  Because investigators knew that COTELL has been arrested several times for narcotics-related crimes, and that her boyfriend, Shaun MILLER had also been convicted of narcotics-related crimes, they established surveillance at 979 Falmouth Road in Hyannis, MA ("Founder's Court").  Precise location information for CHISHOLM's telephone showed that he was at Founder's Court, which is where the mother of his children lives.  Investigators also established surveillance at COTELL's residence in Hyannis, MA.

23.     At approximately 7:44 p.m. that evening, investigators watched as a Nissan Maxima left COTELL's residence and drove directly to a dead end street located near the rear of Founder's Court.  At 7:48 p.m., investigators saw CHISHOLM leave his Founder's Court apartment and meet with the white Nissan.  CHISHOLM entered the rear right-seat of the

15

vehicle, and the vehicle drove approximately 500 feet before it stopped. CHISHOLM then got out of the vehicle and walked directly back to Founder's Court.  CHISHOLM watched the white Nissan as it drove out of the neighborhood.  Based on the short time frame of the interaction between CHISHOLM and the persons inside the white Nissan, and the flurry of contact between the phones used by COTELL and CHISHOLM, investigators believed that a narcotics transaction had taken place.

24.     At 7:52 p.m., when the white Nissan was sufficiently far from Founder's Court, investigators attempted to conduct a vehicle stop of the white Nissan on Route 28. The white Nissan initially stopped, but then fled from the scene.  Approximately three minutes later, the white Nissan collided with an unmarked police car and stopped.  When officers approached the car, officers saw Shaun MILLER in the passenger seat and Brooke COTELL in the driver's seat.  MILLER, who was sitting in the passenger seat, ripped open a plastic baggie, poured the brown powdery substance inside the baggie into what appeared to be a cup of liquid.  As investigators attempted to remove MILLER from the car, MILLER poured the cup of liquid on the ground. MILLER and COTELL were then arrested, and the officers recovered some of the brown powder that had been poured on the floor of the front passenger seat and the ground outside the passenger door.  This brown powder field-tested positive for heroin.

25.     Two telephones inside the car were seized and later searched pursuant to a state search warrant.  The search of COTELL's telephone revealed that CHISHOLM and COTELL orchestrated the sale of 100 grams of heroin to COTELL.  Specifically, COTELL sent a text message to CHISHOLM asking for the price, and he quoted her "1250."  COTELL then

responded that she would pay $12,500 ($8,750 up front with $3,750 paid later) for "100." Based on my training and experience, as well as the recovery of heroin from COTELL and MILLER during the car stop, I believe that COTTELL was asking for 100 grams of heroin. The $1,250 price that COTELL was quoted by CHISHOLM was most likely for a "finger" of heroin, which is 10 grams of heroin.  10 fingers add up to 100 grams, which costs $12,500.  Given that $12,500 is the amount that COTELL agreed to pay CHISHOLM, I believe that COTELL purchased 100 grams of heroin from CHISHOLM on the night of November 16, 2015 and that CHISHOLM delivered this heroin to COTELL and MILLER that evening.

> **2.    Investigators have conducted five controlled purchases of heroin from Denzel CHISHOLM in amounts ranging from 10 grams to over 200 grams.**

26.      As set forth below, in conjunction with the federal wiretap, investigators have used Cooperating Witness 2 ("CW-2") to purchase heroin from CHISHOLM on five separate occasions in amounts ranging from 10 grams to 200 grams.[4]  These controlled purchases were recorded with audio and video.  Further, together with wire interceptions, these controlled purchase have led investigators to believe that: a) CHISHOLM is a large-scale drug dealer who distributes heroin to persons such as Tyrone GOMES and Oliver HAMILTON, and  b)

---

4 CW-2 is cooperating in exchange for consideration on a pending firearm charge in state court. CW-2 has multiple other arrests and convictions stretching back to 2007. CW-2 has provided information that has been corroborated by investigators, and CW-2 has now conducted five controlled purchases of heroin from CHISHOLM, all of which have been watched by investigators and recorded.  In addition, during the controlled purchases, investigators were able to remotely monitor the audio feed in real-time, which has further confirmed that the controlled purchases were made from CHISHOLM.  Accordingly, due to these controlled purchases, I believe that CW-2 is reliable.

CHISHOLM and WILKINS keep a common "stash" of heroin, which they use to supply heroin to their respective customers.

   A. <u>CHISHOLM and WILKINS share a common source or supply of heroin.</u>

  27. This investigation has revealed that WILKINS and CHISHOLM are co-conspirators who obtain heroin as part of a larger DTO, and that they then share this heroin and distribute it to their respective customers.  Investigators have come to this conclusion based on a number of pieces of evidence: 1) they both sell heroin out of 43 Erin Lane in Hyannis, a drug stash house owned by Bethanne HUTCHINGS; 2) wire interceptions and surveillance indicate that they have pooled money together and have traveled to Bristol County together to purchase heroin, 3) they supply each other with heroin when their supplies are depleted, and perhaps most notably, for a few weeks in February and March, 2016, they both sold "blue" tinted heroin (due to the cut added to the heroin), which indicates to me, based on my training and experience, that the heroin they sell comes from the same common source.

  28. As an example of interceptions concerning "blue" heroin, on February 21, 2016 at 4:49 p.m., CHISHOLM had a conversation with a heroin customer about the heroin he was to supply her with:

| | |
|---|---|
| **CHISHOLM** | Hey. |
| **CUSTOMER** | It's not that like kid right [referring to courier delivering the heroin]? |
| **CHISHOLM** | Nah. |
| **CUSTOMER** | Ok, and it's still that **same blue**? |
| **CHISHOLM** | It's a female [referring to courier]. |
| **CUSTOMER** | Ok, but is it the blue stuff? |
| **CHISHOLM** | Oh, I thought you liked the blue stuff? |
| **CUSTOMER** | Yeah, that's why I texted you. |
| **CHISHOLM** | Yeah, yeah, it should be.  That's what I … |

29.     Based on my training and experience I believe that the customer's reference to "that same blue" referred to the blue-tinted heroin that CHISHOLM was then selling.

30.     Likewise, during this same time period, investigators intercepted calls and text messages from WILKINS in which he told customers that he too had blue tinted heroin for sale. As an example, in a February 27, 2016, WILKINS told a customer that all the heroin he had to sell was tinted blue:

| | |
|---|---|
| **CUSTOMER** | I was seeing what you were doing 'cause fuckin,' um, what's up with the work [cocaine], you haven't been grabbing it? |
| **WILKINS** | Nah. |
| **CUSTOMER** | Alright. Cause I got plays [customers] on deck for that.  People said the shit was straight, but they were like, "what the fuck, why is it blue?"  I was like "I don't know."  Fuckin, how long you think til that's done? |
| **WILKINS** | Till what? |
| **CUSTOMER** | Till the blue is done you think? |
| **WILKINS** | I don't know, I got some better shit than that, but it's still blue. |
| **CUSTOMER** | I wanted to grab something too, I was gonna use the money I made off of this on fuckin whatever, cause I'm on OCC, I'm not doing nothing.  I just wanted to make a little bit of bread [money] till I find a job, know what I'm saying? Did you get that text message I sent? |
| **WILKINS** | Yeah, fuckin tell Den[zel CHISHOLM] about the paperwork? |
| **CUSTOMER** | Yeah, fuckin' [CC-6] had me give him the paperwork I got for [ ] identifying him, saying he was his connect and some more shit so 'cause he told [CC-6] he wanted a copy of it.  I have it, I sent it to my crib.  My mother just brought it to me. I got that or whatever and you'll probably see him before me so I'll just give it to you. Yeah, so fucking what you say you do have other shit though? |
| **WILKINS** | Yeah. |
| **CUSTOMER** | What is it? Is it brown? |
| **WILKINS** | Nah, I said I got better shit, but it's the same color. |
| **CUSTOMER** | Oh it's the same color? Oh alright, we'll figure something out.  How much you charging for a whole one that? |
| **WILKINS** | Like 450. |

31.     Based on my training and experience, the customer's reference to a "whole one" was a reference to a "finger" (10 grams) of heroin.  That WILKINS and CHISHOLM were both selling blue heroin indicates to me, based on my training and experience, that WILKINS and CHISHOLM share a common "stash" of heroin, and that both men take from this stash when distributing to other customers.  My belief is reinforced by the fact that, as detailed below, both WILKINS and CHISHOLM sold heroin that they stored at 43 Erin Lane in Hyannis, MA, which is a drug stash house owned by Bethanne HUTCHINGS.

32.     In addition, investigators have intercepted telephone calls in which CHISHOLM and WILKINS re-supply each other with heroin on an as needed basis.  As an example, on January 14, 2016 at 7:38 p.m., investigators intercepted a call between WILKINS and CHISHOLM.  In that call, CHISHOLM told WILKINS, "I need like a half a finger or some shit," to which WILKINS replied, "Oh. Come through."  CHISHOLM responded, "I'll be there in like two minutes."  Based on my training and experience, as well as my knowledge of this investigation, I know that a "finger" is slang for 10 grams of heroin, and therefore, a request for "half" a finger refers to five grams of heroin.  At 7:51 p.m., investigators saw CHISHOLM drive to CW-2 Residence in Hyannis, which was WILKINS' home at the time.  CHISHOLM drove away seven minutes later.  From this telephone call, as well as surveillance, I believe that CHISHOLM collected five grams of heroin from WILKINS at his home.

B.  Late February, 2016 controlled purchase from CHISHOLM.

33.     In late February 2016, CW-2 purchased approximately 10 grams of heroin from CHISHOLM, and in the audio recording of the controlled purchase, CHISHOLM told CW-2 that

he currently possessed "blue" heroin, which further confirms that CHISHOLM was selling blue heroin at that time.  All of the below-mentioned controlled purchases were recorded with audio and video, and further, CW-2 was searched for contraband, money and narcotics prior to the controlled purchases with negative results.  In addition, investigators conducted surveillance during the controlled purchases.

34.     That day, investigators met with CW-2 to make a controlled purchase of heroin from Denzel CHISHOLM.  At 6:19 p.m., CW-2 made a recorded phone call to CHISHOLM, during which CHISHOLM told CW-2 that he had a "spot" where they could meet.  Upon meeting CW-2 in Hyannis, CHISHOLM got into his rental vehicle and directed CW-2 to follow him.  Both vehicles pulled into a residence formerly associated with members of the CHISHOLM DTO ("CW-2 Residence").

35.     CHISHOLM and CW-2 went inside CW-2 Residence.  At approximately 7:10 p.m. that evening, CHISHOLM made an outgoing call to Eelyese MATEO.  Intercepted text messages and calls indicate that MATEO and CHISHOLM are in a sexual relationship.  At 7:23 p.m., CHISHOLM made a second outgoing call to MATEO.   At 7:30 p.m., MATEO drove to CW-2 Residence in her car and parked.   MATEO got out of her car and walked into CW-2 Residence.  MATEO carried with her a white purse.  Shortly thereafter, the door to CW-2 Residence opened, and CW-2 and CHISHOLM walked out.  CW-2 got back inside his car and drove away to a pre-arranged location, where he was met by investigators.  There, CW-2 turned over to investigators a bag that appeared to contain approximately 10 grams of a powder that

later field tested positive for heroin.  CW-2 told investigators that this heroin came from

CHISHOLM, who had received it from MATEO.

36.     After completing the controlled purchase, I reviewed the audio and video

recording made by CW-2 during the controlled purchase.  These recordings corroborated the

information provided by CW-2.  In that regard, during the audio portion of the recording, I had

heard significant discussions about packaging and distributing heroin.  CHISHOLM told CW-2

that he could get CW-2 "the raw D, like raw, dope, heroin."  CHISHOLM told CW-2 that with

the "raw brown" or "raw gray" heroin, CW-2 could "hit the shit like five times," so CW-2 could

turn "one finger" of heroin into "six fingers."  Based on my training and experience, as well as

discussions with CW-2, CHISHOLM was explaining that the raw heroin was so potent that it

could be diluted "five times," which would enable CW-2 to make considerable profit.

CHISHOLM then stated he would give CW-2 a "fucking finger" (10 grams) and CW-2, in turn,

agreed to pay $200 ("2") for the finger of heroin.  Towards the end of the audiotape,

CHISHOLM told CW-2 that in addition to the heroin that he had just sold CW-2, he also had the

"blue shit, the gray blue shit and everyone like that shit."  CHISHOLM told CW-2 that the price

of the "blue shit" was $350 for 10 grams (a "finger").  Accordingly, the audio and video

recording made by CW-2 corroborates CW-2's statements that he received 10 grams (a "finger")

of heroin from CHISHOLM on February 26, 2016, and further corroborates the fact that

CHISHOLM was selling "blue" heroin during that time period.

   C.  Early March 2016 controlled purchase of 50 grams of heroin from Denzel CHISHOLM

37.     In early March, 2016, CW-2 purchased 50 grams of heroin from Denzel

CHISHOLM.  This purchase was precipitated by a trip earlier that day to New Bedford by

CHISHOLM's co-conspirator Christopher WILKINS.  I believe that WILKINS purchased

additional heroin during his trip to New Bedford, and that when he returned, WILKINS provided

a portion of this heroin to CHISHOLM.

38.     The day before this purchase, at approximately 8:00 p.m., investigators watched

as WILKINS left his residence in Hyannis and drove to an alterations store in the Centerville

Shopping Plaza.  This store is owned by WILKINS' mother-in-law.  At approximately 8:16 p.m.,

WILKINS' Nissan Pathfinder arrived at the store (the store was closed); WILKINS' wife got out

of front passenger seat and entered the alteration store.  A few minutes later, WILKINS' wife left

the alterations shop and re-entered the front passenger seat of the Pathfinder.  The Pathfinder

then drove directly to Founder's Court, which is where CHISHOLM is frequently seen and

where CHISHOLM sold heroin to COTELL and MILLER in November 2015.  Approximately

20 minutes later, the Pathfinder left Founder's Court and drove back to WILKINS' residence.

Based on the events that followed as set forth below, I believe that WILKINS and CHISHOLM

were pooling money for a re-supply of heroin, with WILKINS retrieving his money from the

alterations store and CHISHOLM keeping his money at Founder's Court.

39.     The next day, at approximately 12:50 p.m., CW-2 called CHISHOLM to arrange

to purchase heroin from him.  CW-2 told CHISHOLM that CW-2 would meet with him at

around 6:00 p.m., and CHISHOLM said that he would ready around that time or "even later," as

"later" would better.   CHISHOLM wanted CW-2 to call him before CW-2 came.   Based on my

training and experience, I believe that because CHISHOLM wanted to meet CW-2 later in the evening, at that time, CHISHOLM did not have heroin to distribute to CW-2.  CHISHOLM was waiting for a re-supply.

40.     On March 2, 2016, investigators conducting surveillance saw WILKINS' Nissan Pathfinder getting on Route 6 westbound in West Barnstable.  The Pathfinder drove to a store in New Bedford (hereinafter, the "Store"), arriving at approximately 3:24 p.m.  WILKINS' wife drove the car.   Based on prior surveillance and intercepted telephone calls, investigators believe that members of the CHISHOLM DTO obtain bulk heroin in the Store.

41.     At approximately 4:24 p.m. that day, WILKINS left the Store, got back in his car, and drove to the TD Bank located in Centerville Plaza in Hyannis, arriving at 6:38 p.m.  Three minutes later, WILKINS left TD Bank and drove directly to the alterations store.  WILKINS' wife got out of the car and went inside the alterations store.  The alterations store, at that time, was not open to the public.   A few minutes later, WILKINS' wife re-entered the Pathfinder, and she and WILKINS drove first to Founder's Court.

42.     There, investigators watched as WILKINS met with CHISHOLM at approximately 7:00 p.m.  Shortly thereafter, GOMES sent a text message to CHISHOLM.  Three minutes later, CHISHOLM walked out of Founder's Court and met with GOMES in the dead end section of Old Strawberry Hill Road, which is opposite the Founder's Court apartment complex.  GOMES and CHISHOLM met briefly and then GOMES left. GOMES regularly purchased heroin from CHISHOLM over the course of this investigation, and as described below, on March 6, 2016 investigators seized heroin from GOMES that he had just purchased

from CHISHOLM.    Accordingly, although investigators were not intercepting communications at this time, I believe that CHISHOLM had provided GOMES with heroin.

43.    After GOMES departed, at approximately 7:30 p.m., CW-2 made a recorded phone call to CHISHOLM.  During the call, CW-2 told CHISHOLM that CW-2 would pay CHISHOLM $1,750 for 50 grams of heroin.  CHISHOLM told CW-2 to come to Hyannis and meet with him.  Investigators searched CW-2 for drugs, weapons and cash with negative results, and handed CW-2 $1,750 in cash and an audio/video recorder.  CHISHOLM and CW-2 met in Hyannis, and then, CHISHOLM and CW-2 drove in their separate cars to CW-2 Residence, which, as noted above, is a residence formerly associated with a member of the CHISHOLM DTO.  Both CW-2 and CHISHOLM went inside the home.  Approximately 20 minutes later, CW-2 and CHISHOLM left the house and investigators followed CW-2 to a pre-arranged meeting location.

44.    At the pre-arranged meeting location, CW-2 handed investigators a plastic bag that contained approximately 50 grams of a powder that field tested positive for heroin (see Exhibit B).  CW-2 told investigators that CHISHOLM had provided the heroin to him/her inside CW-2 Residence, which had largely been vacated.  According to CW-2, after CW-2 complained about the quality of the heroin provided earlier by CHISHOLM, CHISHOLM told CW-2 that he had better heroin that retailed for $500/10 grams, and that CW-2 and CHISHOLM could do a future transaction in which CHISHOLM would provide 200 grams of heroin to CW-2.  I then reviewed the video and audio from the controlled purchase, and this corroborated the information

provided by CW-2.  Further, the video captured images of CHISHOLM meeting with CW-2, and I identified the voice of CHISHOLM on the audio/video recording.

45.     Accordingly, based on the above-described sequence of events, I believe that in early March, 2016, CHISHOLM and WILKINS first pooled money together to purchase heroin. The next day, WILKINS obtained heroin in New Bedford, and WILKINS provided a portion of this heroin to CHISHOLM later.  CHISHOLM then sold 50 grams of the heroin to CW-2.

D. Early March, 2016, controlled purchase of 200 grams of heroin from Denzel CHISHOLM.

46.     Shortly after the CW-2 purchased 50 grams of heroin from CHISHOLM, CW-2 purchased another 200 grams of heroin from CHISHOLM.  This controlled purchase further corroborates that CHISHOLM had received a re-supply of heroin from WILKINS.

47.     That day, CW-2 made a controlled call to CHISHOLM at approximately 7:30 p.m. to purchase 200 grams of heroin from CHISHOLM.  CHISHOLM did not answer the telephone but he called back a few minute later and told CW-2 to meet at the "spot," which CW-2 knew from prior drug deals to be CW-2 Residence in Hyannis, MA.

48.     At approximately 7:50 p.m., investigators conducting surveillance watched as CHISHOLM's red Ford Fusion rental car drove first to 62 Beth Lane, Hyannis, MA – which  I know to be the home of Eelyesse MATEO.  CHISHOLM got out of the car and went inside the residence.  Approximately four minutes later, CHISHOLM got back in the car and drove to CW-2 Residence in Hyannis, MA.  There, investigators watched as CHISHOLM got out of the car and met with CW-2.  Investigators monitoring the audio transmission device in real time heard CHISHOLM tell CW-2 that they would have to do the drug transaction outside the home

26

because CHISHOLM had forgotten to bring the keys to the residence.  At approximately 8:10 p.m., CW-2 was overheard saying goodbye to CHISHOLM, and CW-2 then got back in his vehicle and drove away.  Investigators followed CW-2 to a pre-determined meeting location.

49.     At the meeting location, CW-2 turned over to investigators a knotted plastic bag that appeared to contain approximately 200 grams of a gray powder that later field tested positive for heroin (See Exhibit A).  CW-2 told investigators that CHISHOLM provided the heroin to CW-2 in exchange for the $3,500 in cash.  CW-2 also asked CHISHOLM for a firearm, but CHISHOLM was hesitant and stated that they (the CHISHOLM DTO members) "hoard" firearms for themselves.  CW-2 then told CHISHOLM that his home had been invaded, and in response, CHISHOLM said he would see what he could do.  CHISHOLM also stated that going forward, CHISOHLM would leave the drugs for CW-2 hidden somewhere, and CW-2 could just collect them himself/herself.  CHISHOLM finally asked CW-2 how long it would take him/her to sell the 200 grams, and CW-2 stated a "couple" of days.  I then listened to the audio and watched the video recording, and this corroborated the information told to investigators by CW-2, including the information about the "hoarding" of firearms.  Based on this sequence of events, I believe that CHISHOLM stored the heroin that he provided to CW-2 at MATEO's residence, which is located at 62 Beth Lane in Hyannis, MA.

E.   Mid-March 2016 purchase of 50 grams of heroin from Denzel CHISHOLM, as delivered to CW-2 by Eelyese MATEO.

50.     In mid-March 2016, CW-2 purchased 50 grams of heroin from Denzel CHISHOLM.  As set forth below, Eelyese MATEO brought the heroin to CW-2 directly from her home located at 62 Beth Lane in Hyannis, MA.

51.     The day before the sale, CW-2 placed a controlled telephone call to CHISHOLM. CHISHOLM told CW-2 that he was "off Cape," but he stated that he would meet with CW-2 the next day.  The next day, at approximately 6:03 p.m., CW-2 sent a text message to CHISHOLM stating, "[C]alle asap ima be out there in an hour n I got that for u I need to talk tho call me when u get a chance asap bro."  At approximately 7:31 p.m., CHISHOLM and CW-2 spoke on the phone, and in the call, CHISHOLM stated that he would meet with CW-2 in 20 to 30 minutes. CHISHOLM was ready for CW-2.  Investigators then provided CW-2 with $5,250 in cash ($1,750 for the 50 grams and the remainder to pay off the earlier drug debt).  CHISHOLM called CW-2 and provided him with a place to meet in Hyannis.

52.     At approximately 8:00 p.m., investigators watched as CHISHOLM met with CW-2 in Hyannis.  There, CHISHOLM told CW-2 that he thought he was being followed. CHISHOLM and CW-2 spoke for about 10 minutes.  Upon reviewing the recording later, CW-2 and CHISHOLM discussed the quality of the heroin provided earlier by CHISHOLM.  CW-2 wanted the quality to rise, but CHISHOLM stated that it would be more expensive if it did.  CW-2 told CHISHOLM that CW-2 would "grab the 50," meaning that CW-2 would take the 50 grams now and provide him with the money.

53.     At approximately 8:25 p.m., CHISHOLM and CW-2 got in their respective cars and drove away.  As he drove, CW-2 told investigators that he had paid $5,250 in cash to CHISHOLM, and in return, CHISHOLM had his "girl" stash the heroin at the "spot" referring to CW-2 Residence, which is where they previously had done the drug deals.  In the audio recording, CHISHOLM can be heard talking on the phone, and CHISHOLM told CW-2 to "grab

28

it from the grill."  Meanwhile, CHISHOLM drove to the Rite-Aid pharmacy in Hyannis, MA, where he stood outside of his vehicle talking on the telephone.  Pen register data showed that CHISHOLM had made an outbound call to MATEO.  At this time, CW-2 had arrived at CW-2 Residence in Hyannis.  CW-2 walked into the backyard, but shortly thereafter, as heard on the recording, CW-2 called CHISHOLM and asked where the heroin was (it was not on the grill).  CHISHOLM hung up the phone with CW-2, made a call to MATEO, and then called CW-2 back.  CHISHOLM told CW-2 that the "bitch is a retard" (referring to MATEO) and that she would deliver "it" to CW-2 soon.

54.     At approximately 8:30 p.m., investigators watched as MATEO drove her Dodge Neon from 62 Beth Lane, Hyannis, MA to CW-2 Residence.   There, investigators watched as MATEO pulled into the driveway and left her vehicle running.  Investigators saw CW-2 walk over to the car and he entered MATEO's vehicle.  On the audio recording, investigators could hear CW-2 meet with a female, who apologized multiple times for the mix-up.  After the transaction, CW-2 got out of the car and MATEO drove away.  Investigators then followed CW-2 back to the Barnstable Police Department where CW-2 turned over a bag containing 50 grams of a grayish/blue powder that field tested positive for heroin.  CW-2 told investigators that CW-2 had received this heroin from MATEO.

F.  Late March 2016 controlled purchase of heroin from CHISHOLM, as delivered to him by MATEO.

55.     As set forth below, in late March 2016, CW-2 purchased approximately 121 grams of heroin from CHISHOLM, and MATEO delivered this heroin to CHISHOLM at 21 Seabrook Road in Hyannis, MA, which is where the sale took place.

56.     In the mid-afternoon on the day of the sale, CHISHOLM drove to 21 Seabrook

Lane in Hyannis.  Shortly thereafter, CW-2 arrived at the residence and met with CHISHOLM.

At approximately 3:00 p.m., CHISHOLM called MATEO, who told him that she was going to

Kohl's shoe store.  CHISHOLM told MATEO to "speed it up" because he had "stuff to do."  At

3:34 p.m., with CW-2 already inside 21 Seabrook Lane, CHISHOLM called MATEO, and in this

call instructed MATEO to bring all of the heroin she stored at her home to him at 21 Seabrook

Lane:

| | |
|---|---|
| **CHISHOLM** | Are we getting any closer to the mission? |
| **MATEO** | I just got home. |
| **CHISHOLM** | Oh. |
| **MATEO** | Yeah. |
| **CHISHOLM** | Oh, so why didn't you call me? |
| **MATEO** | I couldn't call you, 'cause you texted me! |
| **CHISHOLM** | Mmm… |
| **MATEO** | I literally just got in my driveway, you texted me, "What's up?" I just got in my room, you're already calling me. |
| **CHISHOLM** | Calm down. Alright? Calm. |
| **MATEO** | I'm 100% calm, I'm just saying.  So, don't act like I wasn't going to call you. |
| **CHISHOLM** | Alright. Grab um, **grab the blue just grab all the blue** and then meet me over at fucking, um … |
| **MATEO** | Every single one? Like all I have? |
| **CHISHOLM** | Yeah, all the blue and then meet me at Dom's… |

57.     As set forth above, CHISHOLM was selling "blue" heroin during this period, and

his command to MATEO – "grab the blue just grab all the blue" – indicated, I believe based on

my training and experience, that he wanted her to bring all the remaining blue heroin to him at

21 Seabrook Road so that he could sell the heroin.

58.     At approximately 3:51 p.m., investigators watched as MATEO left 62 Beth Lane

and arrived at 21 Seabrook Road at 3:57 p.m.  MATEO parked in the driveway and got out of the

car, carrying with her a white bag.  (See Exhibit E).  MATEO then went inside the home.  At approximately 4:09 p.m., CW-2 left 21 Seabrook Road, got in his car, and drove directly to the Barnstable Police Department, where he was met by investigators.  Once there, CW-2 turned over a plastic bag containing a gray/blue powder that field tested positive for heroin and weighed 121 grams.

59.     Investigators debriefed CW-2 on the purchase, and CW-2 told investigators that CHISHOLM directed CW-2 to 21 Seabrook, and when CW-2 arrived at the residence, CHISHOLM and two other men were inside.  CW-2 described the residence as a "drug house" because he saw numerous empty beer bottles, trash, dirty dishes and a couple couches and a television.  There was also a pit bull in the house.  CHISHOLM told CW-2 that he would have new heroin in three or four days, which would be better than the blue heroin because it was the "fentanyl shit."  CHISHOLM also told CW-2 that another customer was collecting 150 grams of heroin later that night.

60.     Shortly thereafter, another female came into the house, and CW-2 told investigators that CW-2 had met this female before as she (MATEO) had brought CW-2 heroin on prior occasions.  CW-2 watched as the female handed CHISHOLM a big white Tedeschi plastic bag, inside of which contained seven or eight larger bags of heroin.  CHISHOLM then brought out a scale from inside the house and weighed out 120 grams of heroin; in exchange, CW-2 provided CHISHOLM with the money.  CW-2 watched as CHISHOLM weighed out and bagged up the remaining 158 grams of heroin.  CHISHOLM stated that he was bringing this heroin to another customer.

61.     Later, I watched the video and listened to the audio portion of the controlled

purchase, and this recording corroborated what CW-2 told investigators.  Specifically,

CHISHOLM can be heard on the audio portion and seen on the video meeting with CW-2 inside

the home.  CHISHOLM and CW-2 discussed a re-supply of heroin that CHISHOLM was soon

expecting.  CHISHOLM explained that he had "put in the order," and it was going to be "super

straight."  This was not the same "blue shit" that CHISHOLM had now, but rather it would be

"fet," meaning fentanyl, which, according to CHISHOLM, was "way better than the blue shit."

CHISHOLM and CW-2 also discussed CHISHOLM's car, with CW-2 commenting on the rental

car.  CHISHOLM said that he was considering purchasing a "whip" (car) but if he did so, he

would need to put it in his own name as he did not have anyone he could trust to put the car in

their name.  Towards the end of the video, a female (MATEO) entered the residence and CW-2,

CHISHOLM and MATEO went into another room.  A white bag containing what appeared to be

heroin could be seen on the video, and CHISHOLM said that he did not know how much he had

left.  CHISHOLM can also be seen on the video weighing out heroin, bagging it on the video,

counting money, and discussing selling the remaining heroin to another customer.   The audio

and the video confirm that CHISHOLM provided the 121 grams of heroin to CW-2 during the

controlled purchase.

### 3.     CHISHOLM supplied heroin to CC-5, and this heroin was delivered to CC-5 by MATEO.

62.     As set forth below, investigators have intercepted telephone calls between

CHISHOLM and CC-5, in which I believe that CC-5 arranged and completed the purchase of

200 grams of heroin from CHISHOLM.  This heroin was delivered to CC-5 and CHISHOLM by MATEO.

63.     On February 19, 2016 investigators were conducting surveillance in conjunction with intercepting CHISHOLM's telephone calls.  In a text message from 508-815-9804 (later identified as belonging to CC-5), CC-5 told CHISHOLM, "Yo I can meet u around 3 that work … And I got 200 to trade."  CHISHOLM responded, "Yup that's good."   Based upon my training and experience as well as my knowledge of the case, I believe that CC-5 was arranging to "swap" 200 grams of lesser quality heroin for 200 grams of higher quality heroin ("200 to trade").  Previously intercepted telephone calls indicated that CHISHOLM had been distributing poor quality heroin and as a result, he had received numerous customer complaints.  In later intercepted text messages and a telephone call, CHISHOLM directed CC-5 to meet him on Sudbury Lane in Hyannis, MA.  As noted above, until recently co-conspirator Christopher WILKINS lived at CW-2 Residence in Hyannis.

64.     Prior to this meeting, at approximately 11:42 a.m., investigators conducting electronic surveillance watched as CHISHOLM arrived at 43 Erin Lane in Hyannis, MA.  Investigators believe, as detailed herein, that 43 Erin Lane is a heroin stash house owned by Bethanne HUTCHINGS and used by CHISHOLM, WILKINS and others to store heroin.  Approximately one hour later, CHISHOLM sent a text message to MATEO and told her that he had a "mission" for her.  MATEO responded that she would meet CHISHOLM at the "Circle" off "Pitch," meaning off Pitcher's Way in Hyannis, MA.  At approximately 1:08 p.m., MATEO called CHISHOLM and asked if she should "come inside."  Investigators conducting electronic

surveillance saw MATEO arrive at 43 Erin Lane, Hyannis, MA**,** get out of her SUV, and then enter the home (43 Erin Lane).  MATEO carried with her a white bag.  Approximately eight minutes later, MATEO left Erin Lane carrying the same white bag, got in her SUV, and drove away.  Investigators followed MATEO as she drove back to her residence at 62 Beth Lane, Hyannis, MA.  MATEO then got out of the SUV and entered her residence carrying the white bag.

65.     At approximately 1:20 p.m., CHISHOLM and WILKINS left 43 Erin Lane, Hyannis, MA.  CHISHOLM got in his Kia rental car and WILKINS walked down the driveway. CHISHOLM backed out of the driveway and drove to CW-2 Residence in Hyannis, MA. Shortly before CHISHOLM arrived at CW-2 Residence, MATEO called CHISHOLM and asked if she was "still going there."  CHISHOLM responded, "Yes," and that he was "already there." MATEO replied that she was on her way.  At approximately 1:29 p.m., MATEO arrived at CW-2 Residence in her SUV.  MATEO got out of the car with a white bag in hand and walked into CW-2 Residence.  Based on the sequence of events that follow, I believe that MATEO brought with her the heroin that CHISHOLM would then provide to CC-5.

66.     At approximately 2:08 p.m., investigators intercepted a call from CC-5 to CHISHOLM telling CC-5 to drive to the end of Sudbury Lane.  Investigators conducting surveillance saw CC-5, driving a Chevy Tahoe, arrive at CW-2 Residence in Hyannis.   Prior to CC-5's arrival at Sudbury Lane, investigators had seen CHISHOLM park in the driveway of CW-2 Residence.  Investigators watched CC-5 enter the residence.  At approximately 2:56 p.m., investigators saw CC-5 leave the residence, and he drove away in his Chevy Tahoe.  Two

minutes later, MATEO left CW-2 Residence carrying the same white bag.  At approximately

3:00 p.m., police officers conducted a vehicle stop of CC-5's Chevy Tahoe on Route 28 in

Hyannis.  In a search incident to that vehicle stop, no narcotics were found; however, the sole

occupant of the vehicle was identified as CC-5.

67.     The next day, at approximately 10:22 a.m., CC-5 sent a text message to

CHISHOLM stating "O lol yea turned my jack off was made shook after getting posted lol."

Based on my training and experience, I believe that CC-5 was commenting on why he did not

answer CHISHOLM's phone calls the night before.  CC-5 had turned his phone ("jack") off after

the police had stopped him ("after getting posted").   CHISHOLM then asked where CC-5 had

been "posted," and CC-5 wrote back that he had been stopped "pullin' into the pet store by the

school after I left you they kept talking about guns thou cuz someone's bin shootin up houses in

Hyannis."

68.     CHISHOLM then called CC-5 on the telephone, and in the call they discussed the

fact that CC-5 had been stopped and searched by the police, but the police did not find the heroin

inside CC-5's car:

> **CHISHOLM**: Yo, what they um get you right after I seen you?
>
> **CC-5**:  Yeah.
>
> **CHISHOLM**: They didn't say nothing crazy?
>
> **CC-5**:  Nah, they were talking about some fucking shooting shit, asking if I had weapons whatever.
>
> **CHISHOLM**: They didn't search you or nothing?

**CC-5**:  Nah, they pulled me out on some illegal bullshit.  They didn't even have a reason to pull me over but, fucking pulled me over, searched my whip and didn't find nothing.  I mean that's a ill spot but…

**CHISHOLM**:  Damn, that might a been my fault.

**CC-5**:  He was mad surprised he didn't find nothing though.  Said you can go, got nothing.

**CHISHOLM**: It's crazy, cause where were you at Cape Maid Farms?

**CC-5**:  Yeah.

**CHISHOLM**:  Damn we seen them at Cape Maid Farms but it was like after, there was like undercovers and shit.

**CC-5**:  It was a silver whip with some little skinny dude with a goat tee I never even seen him before.

**CHISHOLM**: They were in uniforms?

**CC-5**:  No, no uniform, they were both in street clothes and some old dude too.

**CHISHOLM**: Was one of them bald? Bald dude?

**CC-5**:  No, one of them was wearing a baseball hat so…

**CHISHOLM**: As long as you're good, but from now on we're gonna have to do something different cause I think they be tryna be on me you know what I'm saying.

**CC-5**:  I feel you that shit had me…fuckin'.

**CHISHOLM**: I'm not tryna, imma figure something out.

**CC-5**:  Nah, yeah yeah.  I'm good for a little bit so.

**CHISHOLM**: You test that shit out yet?

**CC-5**:  Nah, after that I just shut down for the night.

69.     Notably, I believe that this call confirms that CHISHOLM had sold heroin to CC-5.  CC-5 told CHISHOLM that he had the drugs hidden in a compartment within the car ("ill spot"), and then CHISHOLM asked CC-5 if he had tested the heroin yet ("[y]ou test that shit out yet?").  CC-5 had not tested the heroin, I believe, because he had been scared due to the police stop ("I just shut down for the night").  Finally, investigators believe that CHISHOLM blamed the car stop on himself ("that might a been my fault") because, I believe, albeit correctly, that CHISHOLM thinks that law enforcement was watching him.

> **4.     A February 27, 2016, heroin sale to CC-6 confirms that MATEO stores heroin at her home, and also confirms that CHISHOLM and WILKINS work together to distribute heroin.**

70.     On February 27, 2016, CHISHOLM placed a call to CC-6's 508-272-8479.  In that call, CC-6 asked CHISHOLM if he still wanted to "grab those subs" as CC-6 had "30, 40 at the most."  Based on my training and experience, I believe that CC-6 was offering to sell 30 or 40 suboxone (Schedule III controlled substance) to CHISHOLM for approximately $10 each.  Investigators believe that CHISHOLM wanted to purchase suboxone so that he could smuggle the suboxone to a fellow gang member who is an inmate at MCI-Norfolk.  CHISHOLM wanted to know if CC-6 was trying to "trade" for them, or whether he wanted cash.  In a text message sent at 1:05 p.m., CHISHOLM stated that he would give CC-6 "15 grams [of heroin] for 40 [suboxone]."  CC-6 accepted the deal.   CHISHOLM and CC-6 then exchanged multiple text messages in which they made plans to meet at CC-6's home, which is located on Pitcher's Way in Hyannis, MA.

71.     Meanwhile, CHISHOLM directed WILKINS to meet with CC-6 to collect the suboxone and drop off the heroin.  In that regard, at 3:20 p.m., CHISHOLM called WILKINS and stated that he "needed [WILKINS] to do [him] a favor" as CHISHOLM was going "off Cape."  CHISHOLM needed WILKINS to "meet up with El Chapo (Eelyese MATEO) and then go see your boy B.DOT," referring to CC-6.   CHISHOLM stated that he would then send MATEO "over there" to meet with WILKINS.  Based upon my training and experience, I believe that CHISHOLM was sending MATEO to deliver the 15 grams of heroin to WILKINS, who would then trade the heroin for suboxone with CC-6.  Investigators then saw on the pen register that CHISHOLM and MATEO exchanged multiple text messages.

72.     Investigators conducting surveillance saw MATEO leave her home and travel to CC-6's home on Pitcher's Way, arriving at approximately 3:45 p.m.  MATEO met with WILKINS in the parking lot on Pitcher's Way, and then she drove directly back to her house. WILKINS, after meeting with MATEO, met with CC-6, who was standing in the shrubbery near his apartment.  At approximately 4:08 p.m., WILKINS spoke on the telephone with CHISHOLM, who asked WILKINS if he had "gotten that done."  WILKINS replied in the affirmative.

73.     Accordingly, I believe that CHISHOLM traded 15 grams of heroin to CC-6 for 40 suboxone pills, and that WILKINS completed the deal.  Further, I believe that MATEO stores heroin for CHISHOLM at her residence, and she provided this heroin to WILKINS in order to complete the deal.

### 5. CHISHOLM supplies Oliver HAMILTON, a Yarmouth resident, with heroin.

74.     As set forth below, investigators have determined that CHISHOLM has distributed heroin to Oliver HAMILTON on multiple occasions, and investigators have further confirmed that CHISHOLM stored the heroin that he sold to HAMILTON at yet another stash house located on Chase Street in Hyannis.

75.     On February 1, 2016 at approximately 3:23 p.m., CHISHOLM received a text message from 508-737-4596,  a phone number that investigators later determined through surveillance is used by Oliver HAMILTON.  In the text message, HAMILTON told CHISHOLM that he might have a "big fish" to which CHISHOLM replied, "How big?" HAMILTON wrote back, "100."  Based on my training and experience, I believe that HAMILTON was asking for 100 grams of heroin from CHISHOLM that HAMILTON would immediately re-sell on to another dealer ("big fish").  At 3:31 p.m., HAMILTON wrote back, "Gonna have to cee you later and converse the mathematics."  The transaction did not take place that day, but the next day, after more calls and text messages to arrange the deal, CHISHOLM directed HAMILTON to the residence of his friend who lives on Chase Street in Hyannis.

76.     CHISHOLM and HAMILTON briefly met at the Chase Street residence on February 2, 2016.  At 1:20 p.m., HAMILTON sent CHISHOLM a message stating "Where you now im ready for you."  CHISHOLM wrote back, "My spot," and HAMILTON responded, "Omw."  At 1:29 p.m., MATEO dropped off CHISHOLM on Chase Street, and CHISHOLM went inside the home.  In a call at 2:30 p.m., CHISHOLM provided HAMILTON with directions

on where to wait for him.  CHISHOLM did not want HAMILTON to come directly to him

because he did not want HAMILTON to bring "random people to the spot," which indicates to

me, based on my training and experience, that the Chase Street residence is a drug stash house.

A short while later, someone driving a Volkswagen collected HAMILTON and drove him to

Chase Street, where HAMILTON met with CHISHOLM for a few minutes.  Based on this

surveillance, as well as the interceptions as set forth below, I believe that CHISHOLM provided

HAMILTON with 100 grams of heroin that CHISHOLM had stored at the Chase Street

residence.

77.     On February 3, 2016 at 2:34 p.m., investigators intercepted a telephone call

between CHISHOLM and HAMILTON.  During this telephone call, CHISHOLM asked if

"everything was straight with that, that's what I'm saying, with that I shit I might have fucked

up, and gave the wrong shit."  To this, HAMILTON responded that customers have told him that

"[i]t burns, it's it whack, I don't it's, I don't know."  Based on my training and experience and

also my knowledge of the investigation, including the abovementioned interceptions with

GOMES, I believe that CHISHOLM was asking HAMILTON about the quality of the heroin

that CHISHOLM had distributed to HAMILTON the previous day.  Investigators had gleaned

from other intercepted telephone calls that CHISHOLM had mixed a batch of poor quality

heroin, and he was calling his customers to inquire about the quality of the product.  As noted

above, on February 2, 2016, investigators had intercepted telephone calls and text messages

where HAMILTON made plans to purchase 100 grams of heroin.  Investigators watched the

transaction take place, but surveillance then lost sight of HAMILTON's car as it drove away

from the deal.  Thus, HAMILTON's complaints about the quality of the heroin provided by

CHISHOLM confirm that CHISHOLM had distributed heroin to HAMILTON the night before.

78.     On February 4, 2016, HAMILTON exchanged text messages with CHISHOLM.

CHISHOLM told HAMILTON that he would "hit [him] after class," meaning that CHISHOLM

would be in touch with HAMILTON after he left class.  At 7:26 p.m., CHISHOLM called

HAMLTON, and HAMILTON told CHISHOLM that he was "kinda ready," and that he had "a

ride."  CHISHOLM told HAMILTON to "head to Sea Street" (in Hyannis) and "call him."  In a

subsequent call at 7:34 p.m., CHISHOLM directed HAMILTON to park and wait for him.

79.     At 7:34 p.m., investigators saw HAMILTON sitting in a parked Chevrolet Cruze

in the driveway of a home on Seabrook Road in Hyannis.  At 7:49 p.m., CHISHOLM called

HAMILTON again, and this time, CHISHOLM told HAMILTON that he was walking down

Oakneck Road (Hyannis, MA).  At approximately the same time, investigators watched as

HAMILTON backed out of the driveway and drove to Oakneck Road, where he stopped his

vehicle on the side of the road.  There, investigators watched as CHISHOLM approached the

driver's side window of HAMILTON's car.  After HAMILTON drove away, investigators

followed HAMILTON to a parking lot on Route 28.  Investigators then stopped HAMILTON's

car, and from HAMILTON's car recovered approximately six grams of a powder that field tested

positive for heroin.

80.     Investigators believe that CHISHOLM continues to provide heroin to

HAMILTON.  In that regard, on March 31, 2016, at approximately 1:05 p.m., HAMILTON and

CHISHOLM spoke on the telephone, and during that call and subsequent calls, CHISHOLM

directed HAMILTON to meet him on Chase Street.  At approximately 1:21 p.m., HAMILTON

arrived at Chase Street, met with CHISHOLM, and then departed five minutes later.  In a call at

5:05 p.m. that afternoon, CHISHOLM called HAMILTON and asked him for a review of the

provided heroin ("given it to anyone yet?"), and HAMILTON responded that they "like it and

it's better than the other shit."  HAMILTON and CHISHOLM then discuss amounts of money

owed with CHISHOLM stating that "all together" they are at "6" referring, I believe, to $6,000.

HAMILTON responded that he thought he owed "15" (referring to $1,500) but CHISHOLM

stated that it was "15 plus 45 on backorder" which totals "60."  Accordingly, from these

intercepted text messages and telephone calls, I believe that CHISHOLM continues to supply

HAMILTON with heroin.

### 6. CHISHOLM supplied Tyrone GOMES with heroin, some of which was seized from GOMES, on March 6, 2016.

81.     Commencing in late January 2016, investigators intercepting CHISHOLM's

telephone heard numerous discussions between CHISHOLM and GOMES concerning

CHISHOLM supplying GOMES with heroin.

82.     On January 29, 2016 at 7:19 p.m., CHISHOLM called GOMES, and told GOMES

that he would supply GOMES with heroin:

**GOMES:**          What's good? You got some good news for me man?

**CHISHOLM:**     I mean I got a little bit of good news, but not too much good news.

**GOMES:**          Oh man. A little is better than nothing. A little is better than nothing,
                    especially in my situation.  I take it how I can get it 'cuz.

**CHISHOLM:**     Where you at now?

**GOMES:**                I'm in Yarmouth.  I'm wherever you need me to be.

**CHISHOLM:**      Yeah, trying to think.  I don't even got a fuckin' whip.

**GOMES:**                I got a whip. I'll come to you.

**CHISHOLM:**      I got a whip, I got it all!

**GOMES:**                You know me man. I'm trying to figure it all out man. What'd you say?

**CHISHOLM:**      I'm trying to think. Trying to think.  Let me, let me try to make something happen.  Let me just figure it out and I'm gonna call you back. You know what I'm saying?

83.     I believe that when CHISHOLM told GOMES that he had a "little bit" of "good news" for him, CHISHOLM was explaining that he could provide a small amount of heroin to GOMES, and that he would provide the heroin later that evening.  GOMES appears to acknowledge this when he responded, "A little is better than nothing. A little is better than nothing especially in my situation. I take it how I can get it cuz."  Accordingly, I believe that GOMES had arranged to purchase heroin from CHISHOLM, and that GOMES would use his car ("whip") to travel to CHISHOLM and collect the heroin.

84.     Later that evening, CHISHOLM contacted GOMES, and the two men engaged in additional conversation.  CHISHOLM directed GOMES to meet him on Seabrook Road in Hyannis.  At approximately 8:19 p.m., investigators watched as a vehicle picked up CHISHOLM on Seabrook Road, drove around the area for approximately three minutes, and then dropped CHISHOLM back off on Seabrook Road.  Although investigators could not see inside the vehicle in order to determine who was driving, based on this surveillance and the previous call

between CHISHOLM and GOMES, I believe that CHISHOLM had just provided GOMES with
the heroin.

85.     The next day, at approximately 8:30 p.m., GOMES called CHISHOLM, and in
this conversation, GOMES had questions about the quality of the heroin provided the night
before by CHISHOLM:

**GOMES**:          Yo, I got a couple questions for you.

**CHISHOLM:**       Alright.

**GOMES:**          Did you, um, did you put that together yourself?

**CHISHOLM:**       Yeah. Why? What's up?

**GOMES:**          Because they're saying it burns.

**CHISHOLM:**       Yeah it's gonna, but it's … you know what I'm saying? That's just for the
                    nose.

**GOMES:**          Alright. I just … I just wanna make sure it wasn't no poison.

**CHISHOLM:**       Yeah, just tell them there's gas in mine. Na, na, na, it's just super good and
                    be like, "nigga cause it's good," the gas is I don't know.  Nigga fire what do
                    you think nigga?  You can't nigga, you know what I'm sayin?

**GOMES:**          You're mad stupid yo!

**CHISHOLM:**       The hell you are. You just having shit, that's why.

**GOMES:**          Na, they're saying it's straight, it's just I guess it's got a little burn I don't
                    know, but …

**CHISHOLM:**       Yeah, that's it.  So just be like, "gas" … say something stupid, nigga.

86.     I believe from this conversation that GOMES had provided the heroin
CHISHOLM had given him to GOMES' customers, and those customers had called to complain

about the quality of the heroin because it was burning their noses when they snorted the heroin.

As GOMES made clear, he wanted to make sure he was not selling "poison."  CHISHOLM then

allayed GOMES' fears and told him that the heroin was "fire" (meaning high-quality) and that

GOMES should not worry.  Despite CHISHOLM's reassurances, in a call CHISHOLM and

GOMES the next day, GOMES told CHISHOLM that the heroin that CHISHOLM had provided

him was actually of poor quality as many customers had been complaining to GOMES:

| | |
|---|---|
| **GOMES:** | Shit man, I'm having a hard time.  I'm getting a lot of complaints on this shit man. |
| **CHISHOLM:** | Yeah? |
| **GOMES:** | Yeah, fuckin' everybody says it's like, it does nothing to them, and like this little bitch that I'm with nigga, she did like three grams of the shit at one time, 'cuz, and was like "nothing," she's like, "I'm fine." |
| **CHISHOLM:** | Ah, I didn't get that from no one else. |
| **GOMES:** | She's like, "mad," she's like, "when they, when they put the heat on it some shit, like when they cook it in the spoon it should be turning into like some type of like solid shit, like gel shit nigga, clogging up the needle," and the bitch where I stay with the crib over here, where I'm at, everybody saying the "shit's no good," I still got like four sticks of the shit. |

87.    In this portion of the call, I believe that GOMES was complaining that the heroin

was weak because one woman "did like 3 grams" of the heroin and she felt "nothing," and other

people, when they cooked the heroin in a spoon, it turned into "some type of like solid shit" that

"clogg[ed] up the needle."  GOMES was upset because he still had forty grams of the heroin left

to sell ("I still got like four sticks of the shit").

**GOMES:**     Ay listen, um, is there any way, right? I need … I need two of them things right? And remember old boy I was telling you that wanted the umm, the 5-0 for the 25?

**CHISHOLM:**     No. No I'm confused man. I don't think you told me.

**GOMES:**     Remember I told you homeboy wanted to get fifty, right?

**CHISHOLM:**     Yeah, yeah. I think you told me something about something like that.

**GOMES:**     Yeah, well, the nigga called me last night, and I told him I was like, "Alright, I'll see you in the morning." The nigga called me like eight times today nigga. He was like, "He wants 50." And I told him, "I'm like I got some shit, but nigga it's going to be 500 all the way through," and he was like, "alright well if it's some good shit I got you." But at the end of the day nigga, I just need the come up cuz.

**CHISHOLM:**     He said, "I just need the come up."

**GOMES:**     Yeah, I mean, at the end of the day I can't be playing games nigga, so I got, like, I think I got like 20, like 27 left something like that. If you could give me like, if you got, like, two, I don't care what it is, to be honest with you. As long as it's something even if it is the same shit that you already gave me, and then I can make the 25 off of him, I can do what you asked me, and I'll still have a rack to spend. I'll be able to give you the $1,500, and I'll still have a rack to spend.

88.    Agents believe that GOMES was informing CHISHOLM that he had a customer lined up who wanted to purchase 50 grams of heroin ("homeboy wanted to get 50, right"). GOMES then explained to CHISHOLM that GOMES had 27 grams of heroin left, and he needed twenty grams of heroin from CHISHOLM ("if you got like two [fingers - 10 grams each] I don't care what it is to be honest with you"). GOMES then explained that he could make $2,500 ("25") from his customer, pay back CHISHOLM, and still have $1,000 to spend ("I'll still have a rack to spend"). As GOMES noted, "I'll be able to give you the $1,500 and I'll still have a"

46

$1,000 "to spend."  The call ended with GOMES offering to meet with CHISHOLM after

CHISHOLM's class.

89.     Between 4:29 p.m., and 7:25 p.m. that afternoon and evening, investigators

intercepted multiple text messages and calls between CHISHOLM and GOMES.  In these

communications, CHISHOLM and GOMES discussed where to meet and how GOMES would

travel to Hyannis.  In a call at 7:25 p.m., CHISHOLM said he had hoped GOMES was closer to

him, and CHISHOLM told him that he might have to leave "it" somewhere and have GOMES

collect it.  Based on my training and experience, I believe that CHISHOLM had expected

GOMES to arrive in Hyannis earlier that evening, and that due to GOMES' late arrival,

CHISHOLM would most likely have to leave the heroin for him in a location outdoors.

90.     At approximately 8:10 p.m., investigators conducting surveillance saw

CHISHOLM at the intersection of Highland Street and Chase Street in Hyannis.  CHISHOLM

walked onto Highland Street, where he proceeded approximately 30 feet, and then he turned

around and walked towards Chase Street.  Two minutes later, GOMES called CHISHOLM.

During that call CHISHOLM told GOMES that he left "it" by a "black chain link fence" near

Highland Street.  GOMES replied that there were "mad police down there," to which

CHISHOLM responded that GOMES should wait and then go back.  The heroin ("it"), according

to CHISHOLM, was at the pole that started near the fence.  At approximately 8:24 p.m.,

investigators saw a 2011 Nissan Altima pull onto Highland Street and park on the left hand side

of the street.  GOMES got out of the vehicle and he walked along the fence.  GOMES appeared

to look at the ground as he walked.  At one point, an investigator saw GOMES appear to stop,

bend over, and pick something up off the ground.  GOMES then walked back to the Altima, got

in the car, and drove away.  A few minutes later, GOMES sent CHISHOLM a text message

which read, "Good looking bro I got that I'll hit you tm so we can link."  I believe that GOMES

had collected the heroin that CHISHOLM had left for him ("I got that").

91.     Investigators began intercepting GOMES' telephone on or about February 24,

2016.  Interceptions between GOMES and customers indicated that GOMES is regularly

involved in the distribution of heroin and cocaine in the Hyannis, MA area.  These interceptions

have further indicated that GOMES was still being supplied heroin by Denzel CHISHOLM.  On

March 06, 2016, based upon the intercept of electronic and wireless communications of Tyrone

GOMES and Denzel CHISHOLM, investigators conducted surveillance as GOMES met with

CHISHOLM and CHISOLM provided GOMES with heroin.   This transaction took place at 43

Erin Lane, Hyannis, MA, which, as noted above, is the heroin stash and distribution house at

which Bethanne HUTCHINGS lives.  As described below, this stash house is used by both

CHISHOLM and WILKINS, indicating further that CHISHOLM and WILKINS have a common

"stash" of heroin that they use.  This heroin was later seized from GOMES in a traffic stop.

92.     At approximately 1:40 p.m. on March 6, 2016, GOMES received a phone call

from CHISHOLM, and GOMES asked if the "blue magic" (heroin) was still around.

CHISHOLM said "yes," and GOMES said that he was "on his way out there" and would call

CHISHOLM later.  Approximately 30 minutes later, GOMES and CHISHOLM spoke again on

the telephone, and GOMES told CHISHOLM he had 10 suboxone for him; CHISHOLM said he

would trade the suboxone for two grams of heroin.  GOMES said he would meet with

CHISHOLM shortly.  GOMES then sent out a number of text messages to customers stating "Got that blue shit fire," and got that "fire D," meaning that he had the "blue" heroin.

93.     At approximately 3:00 p.m., investigators watched as Denzel CHISHOLM arrived at 43 Erin Lane in Hyannis, MA.  CHISHOLM got out of his vehicle and entered into the side door of Erin Ln.  At approximately 3:09 p.m., GOMES called CHISHOLM and CHISHOLM directed him to the Papa Johns restaurant located at 215 West Main St Hyannis MA.   At approximately 3:10 p.m., following phone contact between CHISHOLM and MATEO, investigators observed a Mitsubishi Outlander, being driven by MATEO, arrive in the driveway of 43 Erin Lane, Hyannis, MA.  Investigators watched as CHISHOLM approached the Outlander and leaned into the driver's side window.  Three minutes later, the Outlander backed out of the driveway and traveled north on Pitcher's Way.

94.     At 3:17 p.m., GOMES called CHISHOLM and GOMES told CHISHOLM that he was at Papa Johns; CHISHOLM gave directions to 43 Erin Lane and told GOMES to meet him there.  At approximately 3:22 p.m., investigators watched as GOMES walked up the driveway of 43 Erin Lane and met with CHISHOLM.  GOMES then got back into his black mid-size SUV and drove away.  Approximately five minutes later, a marked police unit pulled over the vehicle and all the occupants were detained.  At first, GOMES denied having drugs on him, but later, at the police station, GOMES revealed to offers that he had a plastic baggie containing heroin secreted within his navel.  Officers then recovered what appeared to be approximately 12 grams of heroin from GOMES' navel.  This heroin field tested positive for heroin.  That the drug deal

occurred at 43 Erin Lane (HUTCHINGS' residence) confirms that CHISHOLM too uses that location to distribute narcotics.

95.     In a post-arrest interview, GOMES admitted he had purchased heroin from CHISHOLM that day, and he admitted making money by selling narcotics.  Further, GOMES told police that he was involved in the September, 2015 killing of Christine Ferreira, who had been stabbed and shot to death at a rest stop off Route 6 in Barnstable.  In that regard, in 2011 Ferreira had testified against a member of the CHISHOLM DTO in relation to a 2009 shooting.  That member was convicted of the shooting and sentenced to nearly a decade in prison at MCI-Norfolk.  On September 18, 2015, GOMES rented a room at the Econolodge Hotel in West Yarmouth, where he met with Ferreira.  GOMES told investigators that in the early morning hours of September 19, 2015, CHISHOLM set up at a rest stop off Route 6 in Hyannis.  There, they waited for GOMES to bring Ferreira to the rest stop on the premise that a supplier had left heroin for Ferreira behind a dumpster at the rest stop.  GOMES brought Ferreira to the highway rest stop where CHISHOLM waited.  CHISHOLM then stabbed and shot Ferreira multiple times.  GOMES' confession has been corroborated by significant evidence, including video at the hotel, historical cellsite data, and DNA from CHISHOLM's blood that had been found at the murder scene next to Ferreira.  GOMES remains in state custody.

**7.     On April 3, 2016, Jason MELLO sold four grams of heroin to a customer in Hyannis, MA.  This heroin was later recovered by investigators.**

96.     As set forth below, investigators believe that MELLO is a heroin customer of Denzel CHISHOLM.  On April 3, 2016, investigators intercepted telephone calls indicating that

MELLO was planning to sell heroin to a customer at the Hyannis Host hotel in Hyannis, MA. After hearing those telephone calls, investigators approached the customer walking away from the hotel and recovered four grams of a heroin/fentanyl mix that had been secreted inside the customer's person.

97.    In late February, 2016, shortly before interceptions of MELLO's TARGET TELEPHONE 11 commenced, investigators believe that MELLO had been re-supplied with a large quantity of heroin.  Due to both the color of the heroin as well as further telephone interceptions, investigators believe that it was CHISHOLM, and other members of the CHAPMAN DTO, who had supplied MELLO with this heroin.  In that regard, in a February 25, 2016 call at approximately 5:02 p.m., MELLO conversed with a customer about the quality of the heroin that MELLO had supplied to the customer:

| | |
|---|---|
| **MELLO:** | What up? Fuckin', um, so you ain't fuckin with that shit? You didn't like it? |
| **CUSTOMER:** | With what? That gray shit? |
| **MELLO:** | Yeah. |
| **CUSTOMER:** | That's what everyone's saying is the color.  The color, the color, the color of it, you know what I mean? |
| **MELLO:** | Yeah |
| **CUSTOMER:** | If you have some new shit let me know I'll fuck with it. |
| **MELLO:** | Huh? |
| **CUSTOMER:** | I said, if you have some new shit nigga, I'll fuck with it. |
| **MELLO:** | If I got what with it? |
| **CUSTOMER:** | If you get new shit, I'll fuck with it, but that shit man niggas be mad iffy and shit about it. |
| **MELLO:** | Yeah. |
| **CUSTOMER:** | Cause no one fucks with it. |
| **MELLO:** | Yeah, I probably won't have nothing for a grip. That's all I got all that shit. |
| **CUSTOMER:** | Mmm, just dump that shit off, know what I mean, get some new new and holla at me it'll work. |
| **MELLO:** | It might be a month. Might be like a month, but I got you. |
| **CUSTOMER:** | A month?! |
| **MELLO:** | Yeah |

**CUSTOMER:**   Damn what you get hit off with a fuckin' brick!?
**MELLO:**        Just about.

98.     Based on my training and experience, I believe that BENNETT was not satisfied

with the quality of heroin provided by MELLO due to the color ("that's what everyone's saying

is the color").  As noted above, on related calls involving CHISHOLM and WILKINS,

customers had complained or commented on the color of the heroin they had provided, as it was

grey heroin with a blue tint.  Many customers did not want this heroin.  Accordingly, due to

these comments about the coloring of the heroin, I believe that this heroin had been provided to

MELLO by either CHISHOLM or WILKINS.  Moreover, I believe that MELLO had acquired a

large volume of the heroin because he said it "might be a month" before he had new heroin.

When queried as to whether he had gotten a "fucking brick" (kilogram) of heroin, MELLO stated

"just about."

99.     Later interceptions confirm that it was CHISHOLM who provided MELLO with

the heroin, as CHISHOLM spoke on the telephone with MELLO about the money.  As

examples, on March 10, 2016 at approximately 12:58 p.m., CHISHOLM sent a text message to

MELLO stating, "we good for today?"  The next day at approximately 6:35 p.m., CHISHOLM

called MELLO.  In the call, MELLO told CHISHOLM that he currently had "three on him" and

another person was about to "bring him two."  MELLO further explained that other people were

late paying him, but that he was in Yarmouth "right now" if CHISHOLM wanted to "come grab

the three."  CHISHOLM asked if MELLO was in the "same spot," and MELLO affirmed that he

was.  CHISHOLM stated that he would send him a text message when he drove to MELLO's

residence.  Based on my training and experience, I believe that MELLO owed CHISHOLM money for the earlier provided heroin.  It is common for drug dealers to "front" or provide on consignment large quantities of drugs, which the recipient is then required to pay back when the drugs are sold.  In this instance, I believe MELLO was telling CHISHOLM that he had $3,000 ("three on him") and another person was bringing him $2,000 ("bring him two").

100.     At approximately 7:31 p.m., CHISHOLM sent MELLO a message that asked, "Address?"  MELLO responded, "22 warbler lane, West Yarmouth," which is MELLO's home address.  At approximately 8:34 p.m., CHISHOLM called MELLO for directions to his residence.  MELLO told CHISHOLM to just "hop out" and he would meet him.

101.     Investigators conducting surveillance watched as CHISHOLM got out of the front passenger side of a dark colored sedan on Warbler Lane in Yarmouth.  CHISHOLM began pacing in the roadway while talking on his cellphone.  A few minutes later, MELLO left his residence (22 Warbler Lane) and met with CHISHOLM in the middle of the street.  Investigators observed a "hand-to-hand" transaction taking place while the two men conversed.  MELLO and CHISHOLM then parted ways, with CHISHOLM driving back to his residence in Yarmouth.  Based on this sequence of events, I believe that MELLO provided CHISHOLM with drug proceeds (most likely $3,000) when they met on Warbler Lane that evening.

102.     On April 3, 2016 at approximately 1:36 p.m., MELLO received an incoming text message from a customer stating, "I only have 180 when u meet where would u wanna link."  I believe based on my training and experience and also the later seizure of heroin that the customer was looking to purchase $180 worth of heroin.  MELLO responded, "I'm at Host," meaning that

53

he was at the Hyannis Host Hotel in Hyannis, MA.  A number of text messages followed

indicating that MELLO and the female customer were planning to meet, and at 2:22 p.m., the

customer called MELLO and asked him if he wanted her to walk over to meet him.  The

customer wanted MELLO to text her his room number.  Shortly thereafter, MELLO sent a text

message stating, "221," meaning that he was in Room 221 at the hotel.  At 2:46 p.m., the

customer called MELLO and said that she was now walking over to meet him.

103.    At approximately this same time, investigators conducting surveillance saw the

customer walk across the parking lot to the Hyannis Host hotel in Hyannis.  When the customer

arrived at the hotel, she walked up to the second floor of the hotel and walked directly to room

221.  The customer was let inside the room.

104.    Approximately 15 minute later, the customer left room 221 and was approached

by investigators as she was walking back across the parking lot.  Investigators first read the

customer her Miranda rights, which she acknowledged, and then questioned the customer as to

whether she had any drugs on her person.  The customer denied having any drugs.  Investigators

then called for a K-9 Unit, and upon doing so, the customer became very nervous.  Investigators

told the customer that if she provided investigators with the drugs, she would not be arrested that

day.  The customer then admitted that she had drugs inside of her vagina.  The customer was

then provided with privacy to remove the drugs, which she did, and hand the bag of white police

over to the police.  (See Exhibit G).  Upon doing so investigators field tested the drugs, and the

drugs field tested positive for heroin and fentanyl.  The customer was then released.

105.     Immediately upon being released, the customer made multiple calls to MELLO advising him of the police presence.  Specifically, the customer sent MELLO a text message stating, "Get the fuck out of there dog I just got stopped by the cops dog they were saying some crazy shit dog."  Later, the customer called MELLO and when MELLO asked what she told the police, the customer said that she did not say anything except that she was seeing a friend for groceries.  Based on the intercepted calls and the heroin seizure, I have probable cause to believe that MELLO distributed heroin to the customer on April 3, 2016.

**E.     Christopher WILKINS is a large-scale drug dealer who distributes heroin and cocaine in Hyannis, MA.**

106.     This investigation has also confirmed that Christopher WILKINS is a large-scale drug distributor in Hyannis, MA.  In addition to intercepting multiple telephones used by WILKINS, investigators have conducted seven controlled purchases of heroin from Christopher WILKINS.  Accordingly, these controlled purchases and wiretap interceptions provide probable cause to arrest WILKINS as well as those persons to whom he is supplying heroin.

**1.     Investigators have conducted seven controlled purchases of heroin from Christopher WILKINS.**

107.     Investigators have conducted seven controlled purchases of heroin from WILKINS in the January/February, 2016 timeframe.  These purchases have ranged from five grams of heroin to 100 grams of heroin.   Two of these controlled purchases are set forth as examples below:

Early February, 2016 controlled purchase of heroin from WILKINS

108.     In early February, 2016 investigators met with cooperating witness 1 ("CW-1") in order to purchase 20 grams of heroin and a firearm from WILKINS.[5] Prior to this meeting, CW-1 told investigators that he had had discussions with WILKINS about the heroin and firearm purchase. CW-1's statements were corroborated by recordings made during previous controlled purchases of narcotics. WILKINS had told CW-1 that he would sell the firearm to CW-1 for $1,300. Investigators then made plans to conduct the controlled purchase at a pre-arranged controlled location in Hyannis. Prior to the controlled purchase, investigators searched the pre-arranged location for contraband and drugs, and did not find any.

109.     At approximately 12:56 p.m., CW-1 placed a phone call to WILKINS to negotiate the above reference purchase. This call was recorded, overheard by investigators, and investigators corroborated that the call had been placed by later analysis of pen register data. Investigators also recognized WILKINS' voice on the telephone. In the conversation, CW-1 asked WILKINS for "2 sticks, 2 of them," and WILKINS responded, "alright." CW-1 then asked WILKINS if he "still wanted to do that thing, sell that." I believe, based on my training and experience and my conversations with CW-1, that CW-1 had asked for 20 grams of heroin ("2 sticks") and a firearm, which CW-1 had previously asked WILKINS for. WILKINS replied

---

5 In the early winter, 2015, local investigators in Hyannis, MA executed a search warrant at a residence in Hyannis, MA. Inside the residence was heroin and heroin packaging materials. An occupant of the residence, now referred to as CW-1, first agreed to solely provide information to investigators, and has now agreed to cooperate proactively by conducting controlled purchases of heroin and fentanyl from WILKINS. CW-1, who is cooperating in the hopes of receiving consideration on future charges related to the heroin, told investigators that CW-1 purchases heroin from a man that he knows as "Degree" a/k/a WILKINS. CW-1 is potentially facing state drug charges for the heroin found in CW-1's home. State authorities have told federal investigators that depending on the degree of cooperation shown by CW-1, CW-1 might not be charged on the state level with possession of the heroin. At the time that CW-1 agreed to proactively cooperate, CW-1 was warned not to engage in criminal activity outside of the control of law enforcement. Nonetheless, in February, 2016, CW-1 was intercepted on the telephone selling heroin to an associate of the CHISHOLM DTO. Despite that, investigators believe that CW-1 is a reliable witness due to the fact that the controlled purchases CW-1 made from WILKINS were all recorded and monitored by investigators.

that he would bring the 20 grams of heroin and that they would "talk (about the firearm) when [he] got there."  WILKINS told CW-1 that he would be there in 30 minutes to complete the deal. At approximately 1:35 p.m., CW-1 made a second recorded call to WILKINS.  In this call, CW-1 asked WILKINS how long he would be before he met with CW-1, and WILKINS replied that he would be there in approximately "10 minutes."

110.     Meanwhile, other investigators conducting surveillance in Hyannis saw that WILKINS' Ford Explorer drove to Pitcher's Lane, where it stopped for a short time, and then to 43 Erin Lane in Hyannis, which is HUTCHINGS' residence.  Investigators watched on a pole camera as WILKINS entered 43 Erin Lane at approximately 1:47 p.m.  One minute later, CHISHOLM's rental car pulled into the driveway of 43 Erin Lane.  CHISHOLM and CC-2 walked into 43 Erin Lane, and then, at 2:18 p.m., CHISHOLM, WILKINS and CC-2 all left the residence shortly thereafter and re-entered their respective vehicles.  WILKINS drove directly to the Quality Inn where CW-1 was waiting for him.  Based on what happened next, investigators believe that WILKINS retrieved heroin from 43 Erin Lane.

111.     At 2:22 p.m., CW-1 was provided with $2,100 in cash, and audio and video recording devices were secreted inside the pre-arranged location.  At approximately 2:29 p.m., WILKINS, driving his Ford Explorer, parked near the pre-arranging meeting location. WILKINS got out of his car and walked to the meeting location, where investigators saw him meet with CW-1.  At 2:34 p.m., WILKINS walked out of the meeting location and re-entered his Ford Explorer.  WILKINS then drove away.  Investigators then went inside the meeting location where they recovered a baggie containing a brown powdery substance that field tested positive

for heroin.  The baggie weighed approximately 21 grams.  CW-1 told investigators that he/she

gave WILKINS $800 for the heroin, and that during their conversation, WILKINS told CW-1

that he could not get the firearm that day, but would let CW-1 know when he was in possession

of the firearm.

112.    Investigators later watched the video of the controlled purchase, which

corroborated the information provided by CW-1.  Specifically, WILKINS entered the

locationand he could be seen holding two cell phones in his hands.  CW-1 asked WILKINS

about the "hammer" (firearm), and WILKINS said it would take too long to procure that day.

WILKINS then removed a plastic bag containing powder from his pocket and placed the bag on

the scale.  After WILKINS was finished, CW-1 handed WILKINS the money and WILKINS

counted the money.

<u>Mid-February, 2016 controlled purchase of heroin from WILKINS.</u>

113.    In mid-February, 2016, CW-1 purchased 100 grams of heroin from WILKINS in

a controlled purchase, and this heroin was delivered to CW-1 at 43 Erin Lane in Hyannis, MA.

114.    At approximately 4:58 p.m., CW-1 placed a recorded call to WILKINS.  During

the telephone call, CW-1 asked WILKINS if CW-1 could "grab the 100" and "do the deal."

WILKINS responded affirmatively, and told CW-1 that the price would be "35" ($3,500) for the

100 grams of heroin.   Other telephone calls were made and text messages were sent to

coordinate the drug deal, and at approximately 6:22 p.m., WILKINS, driving his Ford Explorer,

picked up CW-1 at a location in Hyannis, MA.  WILKINS and CW-1 then drove directly to 43

Erin Lane in Hyannis, where they arrived at 6:31 p.m.  There, investigators watched as

WILKINS got out of the vehicle, knocked on the side door of 43 Erin Lane, and then went inside.  Approximately 15 minutes later, WILKINS left 43 Erin Lane, got back in the Ford Explorer and then drove with CW-1 back to a pre-arranged location, where CW-1 got out of the car and went to CW-1's room.   After WILKINS departed, investigators met CW-1 and recovered from CW-1 one plastic baggie that contained a bluish/tan powder.  This powder, which weighed approximately 101 grams, field tested positive for heroin (See Exhibit C).  CW-1 told investigators that WILKINS had gone into 43 Erin Lane, retrieved the heroin from 43 Erin Lane, and then provided the heroin to CW-1.

115.    Investigators then reviewed the audio from the controlled purchase, which corroborated the statements of CW-1.  Specifically, prior to getting out of the car at the pre-arranged location, WILKINS can be heard telling CW-1 that "It's better than the other shit.  I know its powder, but it's blue."  CW-1 responded, "It's blue?" to which WILKINS replied, "It's gray, its gray-blue."  CW-1 then asked, "You wanted me to sell a brick of that," to which WILKINS responded that it was "no different" from the other heroin provided on earlier occasions.  As set forth above, during this same time period, CHISHOLM was also selling "blue" heroin, indicating that they pooled heroin together for distribution.

116.    Accordingly, from this controlled purchase, as well as the earlier controlled purchases, investigators believe that WILKINS distributes heroin in Hyannis, MA and further, that he and CHISHOLM store their heroin at HUTCHINGS' residence, which is located 43 Erin Lane in Hyannis.

### 2. Christopher WILKINS distributes heroin to Stephanie DAVIS and Anthony HALL.

117.     Anthony HALL and Stephanie DAVIS obtain heroin from WILKINS for re-

distribution.  Throughout the wiretap of WILKINS' telephones, investigators have intercepted

DAVIS repeatedly purchasing heroin (in amounts of approximately 10 grams each time) from

WILKINS.  Investigators have also intercepted DAVIS discussing heroin distribution with

CHISHOLM and collecting heroin from WILKINS.

118.     As an example, on February 29, 2016, DAVIS sent WILKINS a text message

explaining that a customer of hers owed her money for heroin she provided on credit:

> "I was tryin to help him out. He Lagit called me cryin like a baby sayin' he had nowhere
> to go and needed. Dumb I know but I'm a wicked guilt able person. I was tryin to help
> him out. He Lagit called me cryin like a baby sayin he had nowhere to go and needed
> some d to give to a friend so he had a place to crash.  Actually he even said you had said
> it was alright and would take care of it cuz you were gonna giv some d ("dope") to give
> to a friend so he had a place to crash … I'm not stressin the cash I'm more just tryin to get
> ahold of him cuz his babymama is blowin up my phone

119.     As another example, on February 25, 2016, DAVIS sent a text message to

CHISHOLM stating that she got "caught up at work" and that she now had "bread for

[WILKINS]", meaning that she could now pay money for heroin previously received from

WILKINS.  Next, on March 1, 2016, DAVIS sent a text message to WILKINS stating, "Hey you

around? I was tryin to get another stick."  Based on my training and experience, I believe that

DAVIS was asking for a  "finger" (10 grams) of heroin.  WILKINS responded, "Yeah," and

WILKINS and DAVIS then made plans to meet on Strawberry Hill Road, which is next to the

Founders Court Apartments.  Investigators established surveillance and saw WILKINS' Nissan

Pathfinder parked at Founders Court.  At approximately 5:50 p.m., WILKINS and DAVIS

exchanged a number of text messages during which WILKINS told DAVIS to walk towards him. DAVIS parked her car on Old Strawberry Hill Road, walked towards Founders Court apartments, and then returned to her vehicle a few minutes later. DAVIS then drove away.

120.   Next, on March 5, 2016, DAVIS engaged in a text message exchange with CHISHOLM in which DAVIS stated that she was trying to purchase some heroin ("tryin to get alittle") to which CHISHOLM asked if she had first made contact with WILKINS ("Did you hit d[egree]"). DAVIS responded that she had tried to but he was not answering the phone ("he wasn't pickin up"). DAVIS mentioned that a few of WILKINS' drug customers were trying to purchase heroin from her because they could not reach WILKINS ("a few of his plays even hit me up lookin to get some cuz they couldn't get ahold of him").

121.   Likewise, for Anthony HALL, HALL was arrested in November 2015 after police executed a search warrant at his home, which he kept as a stash house for members of the CHISHOLM DTO. A significant quantity of heroin was found at HALL's home, and he is currently facing state drug charges. As set forth below, HALL is now attempting to reintegrate himself with the CHISHOLM DTO (primarily through WILKINS).

122.   On March 11, 2016, investigators intercepting WILKINS' electronic and wireless communications intercepted calls between WILKINS and DAVIS and WILKINS and HALL in which WILKINS facilitated a transaction where heroin went from DAVIS to WILKINS to HALL and finally to a customer, from whom investigators later recovered the heroin.  During the initial conversation, DAVIS told WILKINS she had five grams left (of heroin) and $260 for WILKINS. DAVIS asked to "swap" out the heroin because people were complaining about the

quality of the heroin.  Approximately two hours later, HALL sent a text message to WILKINS stating, "Got one" and "he needs a half cup of soup."  At 2:16 p.m., HALL sent a text message to WILKINS stating, "Making my rise back quietly bro you know your my go to guy for success we got the vineyard back need your help to keep it."  Based on my training and experience, I believe that HALL was telling WILKINS that he was trying to reinsert himself back into drug dealing after his arrest in the fall ("making my rise back quickly bro").   HALL also told WILKINS that he had acquired heroin trafficking territory on Martha's Vineyard ("we got the vineyard back") and he needed WILKINS "help" in providing him with a supply of heroin to keep his hold over Martha's Vineyard.  HALL and WILKINS then spoke on the phone and HALL stated that his customer wanted a "half stick" (5 grams) of heroin.  WILKINS asked HALL if he had money ("u got the bread") and HALL responded in the affirmative.  HALL and WILKINS then made plans to meet in Hyannis near the Cape Cod Hospital.

123.    At approximately 4:19 p.m., investigators intercepted a telephone call between WILKINS and DAVIS, and during the phone call DAVIS stated that she had "250" for him and wanted the "five blue switch out";  DAVIS also asked if she could "grab white."  Based on my training and experience, I believe that DAVIS wanted to return "blue" heroin that WILKINS had previously supplied to her ("five blue switch out"), and she also wanted cocaine ("white").  WILSON agreed.  At approximately 4:53 p.m., investigators intercepted a text message from DAVIS to WILKINS which read "I gotta get back to Harwich to get my brother from practice so can we link up so I can get you this bread and grab the new c[ocaine] and d[ope]."  WILKINS responded, "Yeah."   DAVIS and WILKINS made plans to meet at 43 Erin Lane.  Once there,

DAVIS, now joined by WILKINS, parked her car and went inside the home at approximately

5:05 p.m.  Five minutes later, DAVIS left 43 Erin Lane carrying a white bag.  DAVIS re-entered

her car and drive away.

124.    WILKINS then immediately sent a text message to HALL stating, "1m."  In a

subsequent call, WILKINS told HALL to meet him at the Dockside Bar in Harwich.   At

approximately 5:20 p.m., investigators conducting surveillance saw WILKINS, driving his Ford

Explorer, arrive at the end of School Street in Harwich, MA and HALL entered the Explorer.

HALL and WILKINS drove for a few minutes before WILKINS dropped HALL back at School

Street.  There, HALL met with an unknown male, later identified as K.G. of Vineyard Haven,

MA.  HALL and K.G. engaged in what appeared to be a hand-to-hand narcotics transaction.

After the transaction was completed, K.G. got up and walked in the direction of the Cape Cod

Regional Transportation Authority bus terminal.  At 5:30 p.m., HALL called WILKINS and

thanked WILKINS for seeing him that day.  HALL told WILKINS that he was glad that he had

been "benched" for a little bit as it made him "smarter."  WILKINS then discussed distributing

"raw" (pure) heroin, and HALL responded that he was working up to that before he had been

arrested that fall.

125.    At approximately this same time, investigators approached K.G., who was waiting

for the bus.  Upon being confronted, K.G. immediately turned over a small plastic sandwich bag

that contained approximately five grams of a blue-gray powder that later field tested positive for

heroin.  K.G. told investigators that he came to Woods Hole by ferry from Martha's Vineyard to

purchase heroin from "Nova" who used telephone number 508-360-3806.  This was HALL's

same phone number.  K.G. purchased the five grams of heroin from "Nova" for $350.

Additionally, Nova had supplied K.G. with heroin two to three times each week from April to

August, 2015.

126.    Later that evening, at approximately 6:30 p.m., DAVIS sent a text message to

WILKINS stating, "I literally gave you all the shit I had left so I can't even hit any plays so I

really need to know what's going on and when I can get that stuff."  This confirms that DAVIS

had provided the "blue" heroin to WILKINS that WILKINS then re-sold to HALL.  Further, I

believe that DAVIS intends to distribute the heroin she receives from WILKINS as her statement

that she couldn't "hit any plays" meant, I believe based on my training and experience, that she

could not serve her customers with heroin as she no longer had any for sale.

127.    The next day, on March 12, 2016, CC-2 sent a text message to CHISHOLM

asking "U arnd"?  CHISHOLM wrote back, "Hy" meaning that he was in Hyannis, MA, where

he lives.  CC-2 sent another text message asking CHISHOLM to "Get me," and CHISHOLM

wrote back, "20," meaning that he would come to pick up CC-2 in 20 minutes at his home in

Yarmouth, MA.  At approximately 6:46 p.m., CHISHOLM sent a text message to CC-2 stating

"Come out," and ten minutes later, CHISHOLM called CC-2 and told him that he was outside

waiting for him.

128.    Investigators conducting electronic surveillance watched as MATEO and

CHISHOLM arrived in a Dodge Neon and parked outside of CC-2's home in Yarmouth.  CC-2

came out of his house, got in the car and they all drove to 18 Bodfish Place in Hyannis, MA,

which is a drug stash house rented for CC-2.   At 8:16 p.m., CHISHOLM, CC-2 and MATEO all

left 18 Bodfish Place, and they drove to HUTCHINGS' residence located at 43 Erin Lane in

Hyannis.  CHISHOLM and CC-2 got out of the car and went inside.  At approximately 8:35

p.m., CHISHOLM made an outgoing call to DAVIS.  DAVIS told CHISHOLM she had $80 for

him.  CHISHOLM told DAVIS to come to the "Circle," which is 43 Erin Lane, to "test some shit

out."  Approximately five minutes later, a car pulled up into the driveway of 43 Erin Lane.

CHISHOLM got in the passenger seat of this car, which then drove away.  Based on the

conversations, I believe CHISHOLM provided DAVIS with a new batch of heroin to test.

129.    At approximately 9:08 p.m. that same evening, HUTCHINGS called

CHISHOLM.  During the call HUTCHINGS thanked CHISHOLM for leaving "it" (heroin) for

her, and said that using it was like "waking up from a nap."  Shortly thereafter, CHISHOLM

received a text message from Stephanie DAVIS who provided a review of heroin that he had

wanted her to "test" earlier.  DAVIS stated, "It was really good.  It's much better than what's

going around.  I'd warn people tho just cuz if I had done the usual amount I'd be like you

[kn]ow."  Based on my training and experience, I believe that DAVIS meant that the heroin

CHISHOLM provided her to test was very strong and that users should be "warn[ed]" about its

potency.  CHISHOLM, however, apparently neglected to warn HUTCHINGS.  Later that

evening, police responded to 43 Erin Lane based on reports that HUTCHINGS had suffered a

heroin overdose in her bathroom.  When the police arrived at the home, HUTCHINGS'

boyfriend and son were high from heroin use, and HUTCHINGS was unresponsive in the

bathroom.  HUTCHINGS was then provided with Narcan by the police; HUTCHINGS

immediately vomited and became alert.  HUTCHINGS is expected to make a full recovery.

130.    Finally, on March 23, 2016, commencing at approximately 2:07 p.m.,

CHISHOLM exchanged text messages with Stephanie DAVIS.  At approximately 3:09 p.m.,

investigators watched as DAVIS, driving a sedan, picked up CHISHOLM on Chase Street in

Hyannis.  The vehicle circled slowly through Hyannis, and then CHISHOLM was dropped off

back at Chase Street at 3:12 p.m.  Based on the furtive behavior, as well as DAVIS' prior heroin

purchases from CHISHOLM, I believe that CHISHOLM supplied heroin to DAVIS during this

brief drive.  CHISHOLM walked back into the Chase Street residence.  Investigators,

meanwhile, followed DAVIS as she drove first to a needle exchange program located in

Hyannis, and then to her home in Harwich.  That CHISHOLM supplied DAVIS with heroin is

confirmed by intercepted text messages exchanged between CHISHOLM and DAVIS later that

evening.  In those text messages, DAVIS stated, "Hey I know its late but I just got home to

weigh this out and my scale said it was only a 4.37.  And if I owed you $70 from the other day

and it's 220 wouldn't I owe you 290 not 320."  CHISHOLM responded that DAVIS owed her

"90 from the other day but its good just give me the 290 no biggie."  Based on my training and

experience, I believe that DAVIS' statement that she was only given "4.37" indicates that she

purchased five grams of heroin (a common amount for a lower-level dealer), but that she was

only given 4.37 grams of heroin.

### 3.    On March 7, 2016, Benjamin RODERICK attempted to trade a .38 caliber firearm to WILKINS in exchange for ten grams of heroin, in violation of Title 18, United States Code, Section 924(o).

131.    As set forth above, RODERICK had been intercepted repeatedly over WILKINS'

telephones purchasing heroin for further distribution.  On March 7, 2016, RODERICK was

intercepted over the wire attempting to trade WILKINS a .38 caliber firearm for 10 grams of

heroin (a finger).  WILKINS agreed to the trade, but shortly before they were to meet,

RODERICK's car was stopped by police and the firearm was recovered from RODERICK.  This

agreement between RODERICK and WILKINS was in violation of Title 18, United States Code,

Section 924(o) – conspiracy to possess a firearm in furtherance of a drug trafficking crime.

132.    Commencing on the morning of March 7, 2016, RODERICK, in text messages

with WILKINS, told WILKINS that he was "Gonna need shit soon u around."  WILKINS

responded, "Yup hit me."  At approximately 11:32 a.m., RODERICK called WILKINS and told

him, "**I have a fuckin' .38 revolver with a full clip that I'm trying to sell**."  WILKINS replied,

"You do?" and then "what you want for it?" RODERICK answered, "I don't know I'm trying to

get at least a finger."  Based on my training and experience, I believe that the term "finger" refers

to 10 grams of heroin.  WILKINS replied, "At least a what?" to which RODERICK stated, "Its

fuckin brand new brother, and it has the clip in it."  WILKINS asked, "You want a whole one?"

to which RODERICK replied, "Yeah."  WILKINS then agreed, stating, "**It's gonna kill me, but

uh whatever I might, yeah, fuck it, I'll do it**."  After WILKINS agreed to the trade,

RODERICK responded that he would call WILKINS back in 20 minutes.  In later conversations,

WILKINS told RODERICK to meet him on LaFrance Avenue in Hyannis.  However, WILKINS

then called RODERICK back and told him not to go down LaFrance, but rather, go "to the

apartments."

133.    Shortly thereafter, WILKINS called RODERICK and told RODERICK that he

believed (correctly) that he was being followed.  WILKINS changed the meeting location and

instructed RODERICK to go to Sea Meadow Village.  Shortly before 1:00 p.m., investigators

watched as RODERICK pulled into the Sea Meadow Village parking lot.  WILKINS, who was

already there, instructed RODERICK to park "to the left like when you pull in." Shortly before

they met, WILKINS told RODERICK on the telephone that the "boys" were there, meaning, I

believe based on my training and experience, that the police had arrived.

134.    The police stopped RODERICK's car and told RODERICK to get out of the

vehicle; RODERICK refused.  As a result, RODERICK was removed from the vehicle and

searched.  From RODERICK's right-front pants pocket, investigators recovered a .38 caliber

revolver loaded with five rounds of ammunition.  (See Exhibit D).

**F.**     **Conclusion**

135.     Based on the information provided above, I believe that there is probable cause to believe that CHISHOLM, WILKINS, GOMES, MATEO, HUTCHINGS, HAMILTON, DAVIS and HALL conspired to possess with the intent to distribute and distribute heroin.  I have further probable cause to believe that on November 16, 2015, COTELL and MILLER possessed heroin with the intent to distribute, as did MELLO on April 3, 2016.  Finally, I have probable cause to believe that on March 7, 2016, RODERICK and WILKINS conspired together to possess a firearm in furtherance of drug trafficking.

_____

JOHN H. HAYES
Senior Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to me this the 4th day of
April, 2016.

_____

HON. M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts



69

**EXHIBIT A – 200 grams of heroin (March 3, 2016)**



**EXHIBIT B – 50 grams of heroin (March 2, 2016)**



**EXHIBIT C – 100 grams of heroin (Feb. 18, 2016)**



**EXHIBIT D – Smith and Wesson firearm**



**EXHIBIT E – MATEO delivering drugs to CHISHOLM**



**EXHIBIT F – CHISHOLM and MATEO leaving after drug deal**





EXHIBIT G – Heroin sold by MELLO on April 3, 2016

