UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

CHRISTOPHER WILKINS,

Defendant

CRIMINAL ACTION No. 16-CR-10096

GOVERNMENT OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS

Comes now the United States of America, by William D. Weinreb, Acting United States

Attorney, and Eric S. Rosen, Assistant United States Attorney for the District of Massachusetts,

and files this brief in opposition to Defendant's motions to suppress as follows[1]:

## FACTUAL OVERVIEW

### A.  Wire investigation into the CHISHOLM DTO

1.      As set forth below, after nearly exhausting all other methods of investigation, in

mid-October, 2015, investigators began a wiretap investigation into the drug trafficking

organization led by Denzel Chisholm and Christian Chapman (hereinafter, "Chisholm DTO" or

"Chapman DTO").  The wiretap investigation began with an uncharged co-conspirator, and from

there, quickly progressed to the phone of Christian Chapman, Denzel Chisholm and Christopher

Wilkins.

---

[1] All eight of the wiretap affidavits and the final search warrant affidavit have been filed under seal in an Appendix, and this Court is being provided a courtesy copy of the papers.

2.      Despite the fact that Chapman and Chisholm routinely "dropped" their telephones to thwart the investigation, beginning in late February 2016, investigators began making substantial progress towards the goals of the investigation, which included possessing sufficient evidence to indict and convict members of the Chisholm DTO.  However, although partial progress had been made during the February/March 2016 time period, a number of critical goals continued to elude investigators, including the fact that: investigators had not yet acquired sufficient evidence to charge and convict Chapman; investigators had not identified and obtained sufficient evidence to charge and convict the DTO's sources of supply; and, investigators did not have a complete grasp of the entire scope of the DTO.  The pursuit of these goals forced investigators to continue to seek wiretaps up through and including late March, 2016.

I.     TARGET TELEPHONE 1 (Oct. 19, 2015 to Nov. 12, 2015)

3.      On October 19, 2015, Judge Saylor authorized the interception of Target Telephone 1, as used by Ricardo Powell.  Investigators believed that Powell was supplied heroin by Christian Chapman, amongst others.  These interceptions took place from October 19, 2015 to November 12, 2015.

4.      To develop probable cause to intercept Powell's telephone, investigators made controlled purchases of narcotics from Powell prior to applying for the wiretap.  According to the affidavit filed in support of the wiretap, investigators believed that Powell was receiving small quantities of narcotics from Christian Chapman for further distribution.  The affidavit made clear that Powell was not the final target of the investigation.  Rather, the affidavit detailed the long and violent history of the Chapman DTO, and explained that: "goal of this investigation is to identify each of the members of the CHAPMAN DTO/GANG, and to dismantle the CHAPMAN DTO/GANG through successful arrests and prosecutions of all persons involved in their drug distribution, including their sources of supply."  (¶110).  The affidavit went on to explain that

"[a]t this point in the investigation, where we have only been successful in obtaining a small quantity of narcotics from a street-level dealer (POWELL), we are far from achieving these goals."

    II.    <u>TARGET TELEPHONE 2 (Nov. 6, 2015 to Nov. 13, 2015).</u>

    5.    Once investigators began interceptions of POWELL's TARGET TELEPHONE 1, investigators developed probable cause to believe that Christian Chapman was supplying Powell with narcotics for re-sale. As a result, investigators applied to intercept Chapman's TARGET TELEPHONE 2. On November 6, 2015, Judge Denise Casper authorized the interception of Target Telephone 2, as used by Chapman. Chapman was known as a leader of the Chisholm/Chapman DTO. These interceptions took place from November 6, 2015 to approximately November 13, 2015, which is when Chapman stopped using Target Telephone 2. The short duration of the wiretap of Chapman's Target Telephone 2 prevented investigators from making significant progress into the investigation through these interceptions

    6.    The affidavit continued to identify the goal of the investigation as one of "identify[ing] each of the members of the CHAPMAN DTO/GANG," and to dismantle the CHAPMAN DTO/GANG through "successful arrest and prosecutions of all persons involved in their drug distribution, including their sources of supply." This investigation as far from over, the affidavit explained, because although investigators have determined that "POWELL is distributing narcotics, and that he is most likely being supplied by CHAPMAN," the investigation had been "hampered by the fact that POWELL and his co-conspirators are careful about what they say on the phone, and further, they have been waiting to be resupplied with narcotics." Although the application to intercept CHAPMAN's phone was granted, these interceptions lasted for less than a week as CHAPMAN stopped using this telephone.

    III.    <u>TARGET TELEPHONE 3 (Dec. 2, 2015 to Dec. 21, 2015)</u>

7.     Due to the fact that Chapmen stopped using Target Telephone 2 shortly after Judge Casper authorized interceptions, investigators switched their focus to other co-conspirators, including Denzel Chisholm.  On December 1, 2015, Judge Saylor authorized the interception of Target Telephone 3, as used by Denzel Chisholm, a leader of the Chisholm DTO. These interceptions took place from December 2, 2015 to approximately December 21, 2015, which was when Chisholm stopped using Target Telephone 3.

8.     The affidavit in support of the application to intercept Chisholm's Target Telephone 3 detailed an incident where investigators stopped a vehicle being driven by Brooke Cotell.  Shaun Miller was also in the car.  Investigators believed that Miller and Cotell had just purchased heroin from Chisholm, and a search of Cotell's phone showed that they had in fact purchased 100 grams of heroin from Chisholm.

9.     The affidavit again stated that the goal of the investigation was to "identify each of the members of the CHAPMAN DTO/GANG, and to dismantle the CHAPMAN DTO/GANG through successful arrests and prosecutions of all persons involved in their drug distribution, including their sources of supply."  To show that investigators were serious about going after the sources of supply to the Chisholm DTO, the affidavit detailed a November 11, 2015 trip made by Chisholm, Chapman and Wilkins to the United Barbershop in New Bedford.  (¶¶ 89-97). Investigators believed that these persons were being re-supplied by unidentified peresons at the United Barbershop.  As is made clear in the affidavit, investigators had not obtained conclusive evidence regarding these re-supplies.

10.     The affidavit noted the progress that had been made towards the goals of the investigation:

> Towards that end, the ATF has (a) gathered information from numerous confidential sources, (b) conducted extensive physical surveillance, (c) issued administrative and

grand jury subpoenas, (d) analyzed phone records and pen data, (e) conducted video surveillance of multiple locations associated with the CHAPMAN DTO, (f) electronically tracked TARGET TELEPHONES 1, 2, and 3 (g) conducted controlled purchases of narcotics from POWELL, (h) added new TARGET SUBJECTS, (i) identified CHAPMAN as being the source of supply for POWELL, (j) identified 18 Bodfish Place as a stash house for the CHAPMAN DTO; (k) discerned that the CHAPMAN DTO's source for narcotics most likely lives in New Bedford, (l) seized heroin sold by CHISHOLM, and (m) intercepted the communications of TARGET TELEPHONES 1 and 2.

11.    However, despite those efforts, the investigation was far from complete.  As provided in the affidavit, Agent Hayes noted that "the goals of this investigation can only be achieved by obtaining additional credible evidence to prove beyond a reasonable doubt that POWELL, CHISHOLM, and CHAPMAN, together with their co-conspirators have committed the above-noted federal crimes.  At this point in the investigation, where we have determined that CHAPMAN and CHISHOLM are most distributing narcotics to lower-level persons such as POWELL and COTELL, we are far from achieving these goals.  This investigation, however, has been hampered by the fact that CHAPMAN, CHISHOLM and their co-conspirators are careful about what they say on the phone, and further, CHAPMAN appears to have discarded TARGET TELEPHONE 2 after only a week of investigators' interceptions."

12.    The interception of Chisholm's Target Telephone 3 continued for approximately 19 days until he stopped using this telephone.

IV.    Target Telephone 4 (Dec. 11, 2015 to Dec. 23, 2015).

13.    Soon after Chapman stopped using Target Telephone 2, investigators located a second telephone used by Chapman.  On December 10, 2015, Judge Saylor authorized the interception of Target Telephone 4, as used by Chapman.  These interceptions took place from December 11, 2015 to approximately December 23, 2015, which was when Chapman stopped using Target Telephone 4.

14.     Given that Target Telephone 4 was simply a replacement phone for Target Telephone 2, the probable cause to support the interception of this phone was largely the same as that of Target Telephone 2.  The affidavit further detailed multiple trips to New Bedford taken by Chisholm, Chapman and Wilkins.  As noted, investigators believed that these three men traveled to New Bedford to obtain narcotics.  However, due to the fact that these suspects were conducting business inside different buildings, investigators were having difficulty conclusively identifying the sources of supply.

15.     The affidavit however, made clear that one of the goals of the investigation was to identify these sources in New Bedford: "the goal of this investigation is to identify each of the members of the CHAPMAN DTO/GANG, and to dismantle the CHAPMAN DTO/GANG through successful arrests and prosecutions of all persons involved in their drug distribution, including their sources of supply."  Despite making some progress – such as the seizure of heroin by Chisholm - the affidavit explained how investigators were far from achieving the goals of identifying all of Chisholm and Chapman's co-conspirators.  This was due, in part, to the fact that these co-conspirators were careful on the phone, and their continued use of replacement phones thwarted the investigation.  (¶140).

V.     Target Telephones 5 through 8 (January 2016).

16.     At the point when investigators sought to intercept Target Telephones 5 through 9, investigators had intercepted two phones of Chapman, one phone of Chisholm, and one phone of Powell.  However, due to the fact that Chapman and Chisholm consistently switched phones, investigators had not made significant progress towards the investigations' goals.

17.     Accordingly, investigators sought to intercept additional phones used by Chisholm and Chapman, and, for the first time, telephones used by their co-conspirator Christopher Wilkins.  The affidavit in support of the application detailed: the November 11, 2105

trip by Chapman, Wilkins and Chisholm to New Bedford, MA, where investigators believe that

they went to collect narcotics; the November 16, 2015 distribution of heroin by Chisholm to

Cotell and Miller; interceptions between Wilkins and Chisholm where they discussed a trip to

New Bedford (source of supply); and, seizures of narcotics from customers of Wilkins.  On

January 11, 2015, Judge Saylor authorized the interceptions of Target Telephones 5 (Denzel

Chisholm), 6 and 7 (Christopher Wilkins), and 8 (Christian Chapman).

    18.    In filing the affidavit, investigators again emphasized how the goal of the

investigation was to "identify each of the members of the Chapman DTO/GANG, and to

dismantle the CHAPMAN DTO/GANG through successful arrests and prosecutions of all

persons involved in their drug distribution, including their sources of supply."  Although, the

affidavit noted, the ATF had made some progress towards that goal – the ATF had seized

"heroin sold by Chisholm and Wilkins" – the investigation was still "far from achieving these

goals" due to the fact that "Chapman, Chisholm and their co-conspirators are careful about what

they say on the phone, and further, both Chapman and Chisholm regularly discard telephones."

Critically, investigators believe that additional interceptions would "allow investigators to

develop evidence of who the DTO was "being re-supplied by and who" the DTO supplies

(¶¶184-85):

> Towards that end, the ATF has (a) gathered information from numerous
> confidential sources and sources of information, (b) conducted extensive physical
> surveillance, (c) issued administrative and grand jury subpoenas, (d) analyzed
> phone records and pen data, (e) conducted video surveillance of multiple locations
> associated with the CHAPMAN DTO, (f) electronically tracked TARGET
> TELEPHONES 1, 2, 3, and 4, as well as vehicles used by WILKINS (g)
> conducted controlled purchases of narcotics from POWELL, (h) added numerous
> new TARGET SUBJECTS, (i) identified CHAPMAN and CHISHOLM as being
> suppliers for POWELL, WILKINS and others, (j) identified 18 Bodfish Place and
> other places as a stash house for the CHAPMAN DTO; (k) discerned that the
> CHAPMAN DTO's source for narcotics most likely lives in New Bedford, (l)

seized heroin sold by CHISHOLM and WILKINS, and (m) intercepted the communications of TARGET TELEPHONES 1 through 4.

Despite these efforts, the goals of this investigation can only be achieved by obtaining additional credible evidence to prove beyond a reasonable doubt that WILKINS, CHISHOLM, and CHAPMAN, together with their co-conspirators have committed the above-noted federal crimes.  At this point in the investigation, where we have determined that CHAPMAN, CHISHOLM and WILKINS are mostly distributing narcotics to lower-level persons such as POWELL, COTELL, MELO and SEXTON we are far from achieving these goals.  This investigation, however, has been hampered by the fact that CHAPMAN, CHISHOLM and their co-conspirators are careful about what they say on the phone, and further, both CHAPMAN and CHISHOLM regularly discard telephones.

19.     Chisholm's Target Telephone 5 was activated for interception, however, no calls were actually intercepted because Chisholm had stopped using that phone.  Wilkins' Target Telephone 6 was intercepted from January 12, 2016 to approximately February 7, 2016, and Wilkins' Target Telephone 7 was intercepted from January 12, 2016 to February 10, 2016.  Chapman's Target Telephone 8 was intercepted from January 12, 2016 to February 10, 2016.

20.     Due to the fact that Chisholm had discarded Target Telephone 5 before interceptions even began, investigators sought to intercept Chisholm's replacement phone, which was Target Telephone 9.  On January 29, 2016, Judge Saylor signed an order authorizing the interceptions of Target Telephone 9, as used by Denzel Chisholm.  The probable cause and necessity for this phone was largely based on that of Target Telephone 5.  Interceptions of Target Telephone 9 took place from January 29, 2016 to March 23, 2016, which was when Chisholm stopped using Target Telephone 9.  Judge Saylor had renewed interceptions of Target Telephone 9 on February 26, 2016.

VI.     Target Telephones 9 through 15 (Feb. 24, 2016).

21.     On February 24, 2016, Judge Saylor signed an order authorizing the interceptions of Target Telephone 9 (Denzel Chisholm, renewal), Target Telephone 10 (as used by Christopher Wilkins), Target Telephone 11 (as used by Jason Mello), Target Telephone 12 (as

used by Tyrone Gomes), Target Telephone 13 (as used by Jason Greene), Target Telephone 14
(as used by Denzel Chisholm), and Target Telephone 15 (as used by Christian Chapman).

22.     The affidavit in support of the application detailed interceptions showing that
Chisholm was distributing large quantities of heroin to co-conspirators Tyrone Gomes and Oliver
Hamilton.  With respect to Chapman, the affidavit showed that Chapman distributed narcotics to
Jason Greene (although no narcotics were seized).  In addition, the affidavit described an
attempted re-supply of heroin in New Bedford by Chapman, Chisholm and Wilkins.  On
February 3, 2016, the three men dropped money off in New Bedford, but as of February 9, 2016,
no re-supply had been forthcoming.  Finally, with respect to Wilkins, the affidavit detailed a
number of controlled heroin purchases made by a cooperating witness from Wilkins, and also
explained how investigators believed that Wilkins obtained cocaine from Jason Mello.  However,
missing from the affidavit was any concrete evidence indicating that investigators had identified
– and had discovered enough evidence to prosecute – the suppliers to the Chisholm DTO.

23.     The affidavit made clear that although significant evidence had already been
obtained, additional wiretaps were the "only available investigative technique" which has a
"reasonable likelihood of revealing and securing admissible evidence … to establish the full
scope and nature of the offenses being investigated and the full scope and nature of the targeted
drug trafficking organization and its criminal associates."  As noted, a goal of the investigation
was to identify the DTO's "sources of supply," and although investigators had seized and
purchased heroin from Chisholm and Wilkins, and had intercepted telephones 1 through 9, the
investigation had been hampered due to the fact that the DTO was careful about what they say on
the phone and due to the fact that the DTO regularly discards telephones.  Additional wiretaps
were needed to "develop evidence of who the members of the Chapman DTO are being re-

supplied by," and to "identify the Chapman DTO/GANG *modus operandi* in obtaining, transporting and distributing cocaine and heroin."  The affidavit explained that a cooperating witness had made controlled purchases of heroin from Wilkins (¶¶ 194-197), but the affidavit specifically noted that "[e]ven though CW-1 has made controlled purchases from Wilkins, these controlled purchases, while they could result in criminal charges against Wilkins, do not accomplish the goals of this investigation, in that they will not result in arrests and convictions of the entire Chapman DTO, as well as their suppliers."  (¶197).

24.     Wilkins' Target Telephone 10 was intercepted from February 24, 2016 to March 23, 2016).  Mello's Target Telephone 11 was intercepted from February 24, 2016 to approximately April 3, 2016, after having been renewed on March 23, 2016.  Gomes' Target Telephone 12 was intercepted from February 24, 2016 to March 7, 2016, which was when Gomes was arrested and detained.  Greene's Target Telephone 13 was intercepted from February 27, 2016 to March 9, 2016.  Chisholm's Target Telephone 14 was intercepted from February 25, 2016 to approximately March 5, 2016, which was when Chisholm stopped using Target Telephone 14.  Chapman's Target Telephone 15 was intercepted from February 24, 2016 to approximately March 22, 2016.

VII.     Target Telephones 11, 15-17 (March 23, 2016).

25.     On March 23, 2016, Judge Saylor signed a final order authorizing the interceptions of Chapman's Target Telephone 15 (which was never intercepted as he had dropped the phone), Chisholm's Target Telephones 16 and 17, and Mello's Target Telephone 11 (as discussed above).  Chisholm's Target Telephone 16 was never intercepted as he had stopped using that phone.  Chisholm's Target Telephone 17 was intercepted from March 23, 2016 to April 5, 2016, which was when Chisholm was arrested.

26.     The affidavit detailed multiple controlled purchases of heroin that had been made from Chisholm, and further detailed the arrest of Tyrone Gomes, who had obtained heroin from Chisholm.  In addition, the affidavit explained how Chapman uses telephones to pay for a drug trafficking stash house on Bodfish Lane in Hyannis.  The affidavit noted, however, that the goal of the investigation was to arrest the entire Chapman DTO.  To that end, the affidavit summarized the evidence that had been obtained thus far:

> Towards that end, the ATF has (a) gathered information from numerous confidential sources and sources of information, (b) conducted extensive physical surveillance, (c) issued administrative and grand jury subpoenas, (d) analyzed phone records and pen data, (e) conducted video surveillance of multiple locations associated with the CHAPMAN DTO, (f) electronically tracked TARGET TELEPHONES 1, 2, 3, and 4, 7, 8, 11, 12 and 13, as well as vehicles used by WILKINS, MOTT-FRYE, RUSS and CHISHOLM (g) conducted controlled purchases of narcotics from POWELL, CHISHOLM and WILKINS, (h) added numerous new TARGET SUBJECTS, (i) identified CHAPMAN and CHISHOLM as being suppliers for POWELL, WILKINS, GREENE and others, (j) identified addresses on Bodfish Place, Erin Lane and Chase Street in Hyannis as stash houses for the CHAPMAN DTO; (k) discerned that the CHAPMAN DTO's source for narcotics most likely lives in New Bedford, (l) seized heroin sold by CHISHOLM and WILKINS, and (m) intercepted the communications of TARGET TELEPHONES 1 through 15.
>
> Given these efforts, investigators have developed sufficient evidence to charge multiple members of the CHAPMAN DTO with narcotics crimes, including persons such as WILKINS, CHISHOLM, GOMES, HUTCHINGS, DAVIS and HALL.  Towards those ends, investigators plan to soon charge multiple members of the CHAPMAN DTO and execute search warrants on March 29, 2016 at locations associated with the CHAPMAN DTO.  Accordingly, investigators have compiled sufficient evidence against a number of members of the CHAPMAN DTO.  **However, investigators have not yet developed sufficient evidence to charge CHAPMAN himself, who is one of the leaders of the CHAPMAN DTO**.  Additionally, investigators believe that additional evidence is needed to convict persons such as Jason MELLO.  The interceptions of TARGET TELEPHONES 9 through 15 are scheduled to end on March 24, 2016.  This present application and Affidavit seeks to extend those interceptions for three persons – CHAPMAN, MELLO and CHISHOLM – in order to develop additional evidence that will hopefully lead to charges against both CHAPMAN and MELLO when search warrants are executed on March 29, 2016.  Because people such as Christian CHAPMAN do not generally keep large quantities of heroin inside their homes and instead use stash houses, without wire and electronic

communications, it will be difficult to charge MELLO and CHAPMAN for heroin found at various stash houses in Hyannis, MA.  **In addition, interception of CHISHOLM's telephones is needed because CHAPMAN frequently "drops" his telephone.  As such, interceptions of CHISHOLM's telephones will ensure that investigators are kept apprised of CHAPMAN's movements as well.**  Extending the interceptions of CHAPMAN and MELLO (and continuing to intercept CHISHOLM) will enable investigators to develop sufficient evidence to indict and convict all the members of the CHAPMAN DTO (including persons such as CHAPMAN and MELLO) and determine the full scope of their involvement in the TARGET OFFENSES.  (¶¶102-103).

27.      Thus, the affidavit clearly explained why additional wiretaps of Chapman and Mello were needed (at that point there was insufficient evidence to charge them), and also why investigators needed to keep up the interceptions of Chisholm's telephones (Chapman frequently discarded his telephone).  Notably, investigators ceased intercepting Wilkins' phones at this point.  Finally, the affidavit detailed the fact that although investigators had, at this point, used two cooperating witnesses as part of the investigation, these witnesses could only purchase heroin from Chisholm and Wilkins, and investigators did not have witnesses with an ability to purchase narcotics from other co-conspirators.  (¶¶134-35).

**B.  On March 29, 2016, investigators obtained a search warrant for the residence of long-time drug dealer Christopher Wilkins.**

28.      The warrant filed here that permitted the search of Wilkins' residence (together with numerous other residences) was 139 pages and it set forth a detailed description of the massive heroin trafficking ring that was run by the Chisholm drug trafficking organization ("Chisholm DTO").  As set forth in the affidavit, which is filed as part of the sealed appendix, Wilkins was a leader of the Chisholm DTO and he sold narcotics on a daily basis for profit.

29.      Initially, the warrant set forth the "Target Offenses" that were the subject of this warrant.  (¶7).  Although the standard drug offenses were included, the target offenses also included money laundering and firearms possession.  The agent then detailed the "specialized knowledge he has gained over the nearly two decades as a drug and gun investigator"

Specifically, the agent set forth that drug dealers are likely to keep evidence of their drug dealers in their homes, and that such evidence is likely to be found for "months" even after a drug deal occurred.  (¶10).  The agent noted that searching residences and drug stash houses can result in the recovery of evidence which despite the fact was "non-narcotic," was valuable to prove the drug trafficking crimes.  (¶13).  The agent described how this non-narcotic evidence included: owe sheets, cellular telephones, large quantities of money, evidence of financial transactions and records relating to income and expenditures of money and wealth, firearms, ammunition and other dangerous weapons and other assets showing their wealth.

30.     Specifically, the affidavit first described Wilkins as a member of the DTO, and set forth how investigators conducted numerous controlled purchases of heroin from him over the course of the investigation and also intercepted three of his telephones including, most recently, Target Telephone 10.  From those interceptions, investigators believed that "Wilkins distributes both street-level (user) quantities of heroin and cocaine as well as larger quantities of other drug dealers."  Wilkins, according to the affidavit, lived at 825 W. Main Street, Unit 11, Hyannis, MA.  Para. 34(c).  The affidavit next provided a description of 825 West Main Street, detailing how Wilkins used two vehicles to deliver narcotics – a Ford Explorer and Nissan Pathfinder.  In addition, during the controlled purchases made by a cooperating witness, Wilkins discussed "procuring firearms" for that witness.  Para 36(d).

31.     The affidavit further detailed how investigators used multiple cooperating sources to glean information about the Chisholm DTO.  Specifically, cooperating source 3 ("CS-3") told investigators how Chisholm, Chapman and Wilkins worked together to sell heroin (¶42) and that Wilkins provided heroin to Anthony Hall (¶44).  CS-5 stated that Wilkins had sold him/her drugs in the past.

32.     Next, investigators described how Wilkins used to live at 263 Sudbury Lane in

Hyannis, but had since moved to 825 W. Main Street.  (¶52).  Nonetheless, Chisholm and others

continued to use 263 Sudbury Lane continued to use 263 Sudbury Lane to conduct drug

transactions, including one on February 26, 2016.  *Id.*  The affidavit further described what

appeared to be a drug re-supply in new Bedford.  (¶¶57-62).  Investigators watched as Wilkins

first appeared to collect money at "Cape Cod Alterations," a shop owned by Wilkins' mother-in-

law, and then Wilkins drove to meet Chisholm.  The next day, Wilkins drove to the United

Barbershop in New Bedford, which appeared to be a source of supply for the Chisholm DTO.

The affidavit detailed how Wilkins, after returning to Cape Cod, met with Chisholm.  Chisholm,

shortly thereafter, reached out to and met with a drug customer of his (Tyrone Gomes).  Wilkins

then returned to his home at 825 West Main Street.  Investigators believe that Wilkins had

provided Chisholm with heroin that he had sourced from United Barbershop.

33.     In addition, the affidavit set forth a number of controlled heroin purchases made

by a witness from Wilkins.  (¶¶150-59).  The affidavit also discussed a heroin delivery that

Wilkins made on behalf of Chisholm (¶¶89-92).   As the affidavit explained, these controlled

purchases of heroin were for between five and 100 grams of heroin.

34.     As set forth above, investigators learned in early February 2016 that Wilkins was

moving from 263 Sudbury Lane to 825 West Hyannis Street, Unit 11.  (¶146.)  The affidavit then

explained how Wilkins kept narcotics and drug proceeds at his residence (¶¶147-50):

> Investigators have conducted surveillance on numerous occasions after February 15,
> 2016, and this surveillance shows that WILKINS now lives at **825 West Main
> Street, Unit 11 in Hyannis**.  The surveillance on March 1 and 2, 2016 has been set
> forth above.  As another example, on February 27, 2016 at approximately 3:53 p.m.,
> WILKINS received a phone call from Benjamin RODERICK asking to meet
> RODERICK at his residence – 940 West Main Street – for a "Q tip."  Although
> investigators believe that a "Q tip" is drug related, it is difficult to determine which
> drug and what quantity from the context of the telephone call.  At approximately 3:56

p.m., investigators conducting surveillance of WILKINS saw him driving his Nissan Pathfinder to his home located at **825 West Main Street in Hyannis**.  At 4:02 p.m., WILKINS entered 825 West Main Street, Unit 11, and at 4:29 p.m., WILKINS left 825 West Main Street and drove to RODERICK's residence at 940 West Main Street. Approximately five minutes later, WILKINS left RODERICK's residence and drove back to 825 West Main Street.

In addition, investigators have probable cause to believe that WILKINS keeps narcotics at his house.  In addition to the February 27, 2016 example noted above, on January 14, 2016 at 7:38 p.m., investigators intercepted a call between WILKINS and CHISHOLM.  In that call, CHISHOLM told WILKINS, "I need like a half a finger or some shit," to which WILKINS replied, "Oh. Come through."  CHISHOLM responded, "I'll be there in like two minutes."  Based on my training and experience, as well as my knowledge of this investigation, I know that a "finger" typically refers to 10 grams of heroin, and therefore, a request for "half" a finger refers to five grams of heroin.  At 7:51 p.m., investigators saw CHISHOLM drive to 263 Sudbury Lane in Hyannis, which was WILKINS' home at the time.  CHISHOLM drove away seven minutes later.  From this telephone call as well as surveillance, I believe that CHISHOLM collected five grams of heroin from WILKINS at his home.

Finally, there is also probable cause to believe that WILKINS is in possession of drug proceeds, and based on my training and experience, I know that drug dealers commonly keep at least some of their drug proceeds at their home.  In that regard, investigators have queried Massachusetts Department of Revenue databases, and these databases show that neither WILKINS nor his wife had any reported income in 2014 and 2015.  Investigators do know, however, that WILKINS' wife works part-time at **Cape Cod Alterations**, which is the store owned by Wilkins' mother-in-law. Investigators further know from this investigation that WILKINS has no job. Nonetheless, WILKINS and his wife have deposited large amounts of cash into two bank accounts.  In 2015, WILKINS and his wife deposited $94,478 in cash into their accounts, and in 2014, they deposited $69,860 in cash into their accounts.

35.     The affidavit then continued on to describe Wilkins' heroin distribution to other customers.  Paragraphs 160 through 170 describe multiple heroin deals to Anthony Hall and Stephanie Davis up through March, 2016.  Paragraphs 171 through 180 describe how Mott-Frye distributed cocaine to Wilkins on multiple occasions, with these deals occurring at 263 Sudbury Lane in Hyannis.  One of the deals occurred while Wilkins lived there, and a second deal occurred after Wilkins had moved out.

36.     Based on the above-provided information, on March 29, 2016 Magistrate Judge Dein issued a search warrant for 825 W. Main Street #11, and this search warrant was executed on April 5, 2016.  During the search, investigators recovered numerous cellular telephones belonging to Wilkins, drug packaging materials such as Inositol, a Nutri Bullet blender, plastic containers and digital scales, financial information such as tax returns, and a Sturm Ruger firearm and ammunition in the basement.  In essence, investigators recovered the evidence that was described in the search warrant affidavit prepared in advance of the search.

**C.  Judge Saylor correctly concluded that the wiretap affidavits for Target Telephones 9 through 17 were supported by sufficient "necessity."**

37.     In moving to suppress the wiretaps for Target Telephones 9-17, Wilkins does not contest that the Government had probable cause to tap these telephones.  Rather, Wilkins argues that the Government lacked "necessity" to intercept those telephones because the "goals of the wiretap had [already] been accomplished as of the time that wiretaps were sought for TTs 9-15, and certainly no later than the time that wiretaps were sought on TTs 11, 15-17."  In the alternative, Defendant contends that to the extent any of the "investigative goals were not fully accomplished, those goals were overly broad and calculated to manufacture necessity." Defendant's arguments are meritless and can be rejected.[2]

     I.   <u>Overview of Necessity</u>

---

[2] Defendant seeks to suppress all intercepts from Target Telephone 9 to Target Telephone 17. Defendant, however, was not intercepted on Target Telephones 13 and 16.  As a result, Defendant lacks standing to challenge the orders as Target Telephones 13 and 16, as he is not an aggrieved person under Title III with respect to those orders.  *See United States v. Asaro*, 2014 WL 2808261 (D. Mass. June 20, 2014); *United States v. Charles*, 1998 WL 204696, *11 (D. Mass. Jan. 13, 1998) (standing is limited to those "whose voices were actually intercepted), aff'd, 213 F.3d 210 (1st Cir. 2000); *United States v. Lyons*, 2011 WL 3665383 (D. Mass. Aug. 18, 2011).

38.     The statutory requirement of "necessity" is well-familiar to this Court.  Under
Title 18, United States Code, Section 2518(1)(c), the government must "include a full and
complete statement as to whether or not other investigative procedures have been tried and failed
or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Simply
stated, the government should demonstrate in the wiretap affidavit that the government has made
a "reasonable, good faith effort to run the gamut of normal investigative procedures before
resorting to means so intrusive as electronic interception of telephone calls."  *United States v.
Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003); *see also United States v. Cartagena*, 593 F.3d
104, 109 (1st Cir. 2010). However, the government "need not demonstrate that it exhausted all
investigative procedures."  *United States v. Santana*, 342 F.3d 60, 65 (1st Cir. 2003).   Further, in
reviewing the government's showing of necessity, the task of a reviewing court is to ascertain
whether the facts in the application "<u>were minimally adequate</u>" to support the determination
made by the issuing judge that necessity existed.  *Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003)
*United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989).

II.     The February 24, 2016 wiretap affidavit properly detailed "necessity."

39.     The Government will first begin with the February 24, 2016 affidavit signed by
Judge Saylor that authorized the wiretap of Target Telephones 9 (Chisholm), 10 (Wilkins), 11
(Mello), 12 (Gomes), 13 (Greene), 14 (Chisholm), and 15 (Chapman).   Chisholm, Wilkins, and
Chapman had all been intercepted in earlier applications, while the Government was intercepting
Mello, Gomes and Greene for the first time.   The affidavit repeated the previously stated goals of
the investigation: "identify each of the members of the Chapman DTO/GANG, and to dismantle
the CHAPMAN DTO/GANG through successful arrests and prosecutions of all persons involved
in their drug distribution, including their sources of supply."  (¶161).

40.     The affidavit then noted that partial success had been achieved thus far in the

investigation (¶ 162):

> Towards that end, the ATF has (a) gathered information from numerous
> confidential sources and sources of information, (b) conducted extensive physical
> surveillance, (c) issued administrative and grand jury subpoenas, (d) analyzed
> phone records and pen data, (e) conducted video surveillance of multiple locations
> associated with the CHAPMAN DTO, (f) electronically tracked TARGET
> TELEPHONES 1, 2, 3, and 4, 7, 8, 11, 12 and 13, as well as vehicles used by
> WILKINS, MOTT-FRYE and CHISHOLM (g) conducted controlled purchases of
> narcotics from POWELL and WILKINS, (h) added numerous new TARGET
> SUBJECTS, (i) identified CHAPMAN and CHISHOLM as being suppliers for
> POWELL, WILKINS, GREENE and others, (j) identified addresses on Bodfish
> Place, Erin Lane and Chase Street in Hyannis as stash houses for the CHAPMAN
> DTO; (k) discerned that the CHAPMAN DTO's source for narcotics most likely
> lives in New Bedford, (l) seized heroin sold by CHISHOLM and WILKINS, and
> (m) intercepted the communications of TARGET TELEPHONES 1 through 9.

41.     The affidavit explained that despite the efforts of the ATF, the evidence adduced

thus far was not sufficient to "prove beyond a reasonable doubt that WILKINS, CHISHOLM and

CHAPMAN, together with their co-conspirators" had committed federal drug crimes.  (¶ 163).

Instead, the investigation had uncovered only the fact that Chapman, Chisholm and Wilkins were

distributing narcotics to lower-level distributors, and further, the investigation had been

hampered by the fact that "Chapman, Chisholm and Wilkins regularly discard telephones."  (*Id.*).

Accordingly, interceptions of telephones 9 through 15 were needed to "develop evidence of who

the members of the Chapman DTO are being re-supplied by, and who the Chapman DTO

supplies with narcotics."  (¶ 164).  As such, the wiretap was needed to "identify the Chapman

DTO/Gang *modus operandi* in obtaining, transporting and distributing cocaine and heroin,

including the identity of all the DTO's customers and co-conspirators, storage locations, and

their processes for laundering drug proceeds."  (para. 164).

42.     Finally, the affidavit went on to detail why ordinary investigative techniques

could not work.  Specifically, the affidavit explained that: undercover agents could not penetrate

the Chapman DTO (¶¶ 167 to 168), confidential sources had made controlled purchases from

Wilkins, but no purchases had been made from the other defendants and no confidential sources

or witnesses could identify the suppliers to the DTO (¶¶ 169 to 209), a grand jury investigation

was insufficient due to the lack of witnesses (¶¶ 210 to 215), pen registers were helpful but

investigators did not obtain "content" with pen registers (¶¶ 216 to 218), physical surveillance

was conducted almost every day, but was generally unhelpful without intercepted telephone calls

(¶¶ 219 to 221), and that other investigative techniques such as search warrants or trash pulls

would also likely bear little fruit due to the fact that the Chapman DTO stored narcotics outside

and in various unidentified stash houses (¶¶ 222 to 230).  For all these reasons, and others, Judge

Saylor correctly determined that investigators had shown "necessity" for the various wiretaps

being sought.

      43.     Defendant, in his motion, does not appear to dispute the herculean efforts put

forth by investigators here.  Rather, Defendant asserts that by the time investigators sought a

wiretap for Target Telephones 9 through 15, investigators had already achieved their

investigative goals.  Defendant is correct that at the time investigators sought the wiretap on

February 24, 2016, investigators had conducted controlled purchases from Wilkins; however,

this partial success in obtaining evidence against Wilkins did not render the goals of the wiretap

obsolete.  *United States v. Cao*, 471 F.3d 1, 3 (1st Cir. 2006) (holding that partial success using

investigative technique does not disprove necessity); *see also United States v. Cartagena*, 593

F.3d 104, 110 (1st Cir. 2010) (same); (¶197 – controlled purchases "do not accomplish the goals

of this investigation, in that they will not result in arrests and convictions of the entire Chapman

DTO, as well as their suppliers").

44.     Hre, the wire affidavit was forthright with Judge Saylor in explaining the successes had by investigators, which included the controlled purchases made by Wilkins. However, the wire affidavit made clear that a goal of the investigation was to prosecute "all persons involved in their drug distribution, *including their sources of supply*."  The affidavit went to great lengths to detail how Chisholm, Chapman and Wilkins travelled to New Bedford to source narcotics, but despite investigators' best efforts, investigators were neither able to identify who was supplying the narcotics in New Bedford nor develop sufficient evidence to indict.  (¶¶ 43, 71, 82-89, 200, and 236).  This failure to achieve the critical goal of identifying the suppliers – due in part to the suspects' consistent recycling of telephones – mandated the continued use of wiretaps to achieve these goals.

45.     Defendant asserts that the "main goal" of the investigation was to "identify each of the members of the Chapman DTO/Gang."  (¶161).  In fact, the main goal of the government's investigation was to "dismantle the Chapman DTO/Gang through successful arrests and prosecutions of all persons involved in their drug distribution, including their sources of supply." (*Id*.)  By February 24, 2016, investigators had evidence sufficient to prosecute only one or two members of the Chapman DTO (Wilkins and potentially Chisholm).  Simply stated, the investigation was far from complete as the goals of the investigation had not been accomplished.

46.     Defendant's summary of the evidence on page 13 of his motion highlights the fatal flaws in his argument.  In that regard, Defendant acknowledged that although controlled purchases had been made from Wilkins, he concedes that a source of resupply had not yet been identified.  The best that Defendant can point to is the fact that investigators "had evidence to show that Wilkins picked up his resupply in New Bedford."  Defendant's critical admission in this regard highlights the weakness of his argument.

47.     Moreover, although Defendant points to pen register data, physical surveillance, and intercepted calls, Defendant fails to explain how this evidence would have proven the guilt of the Chapman DTO beyond a reasonable doubt.  Indeed, without seized heroin – which, at that point had come almost exclusively from Christopher Wilkins – it would have been difficult for investigators to prove guilt.  Simply highlighting physical surveillance and pen register data, together with intercepted phone calls, does not amount to guilt beyond a reasonable doubt without seized heroin from the major players.  *See, e.g., United States v. Albertelli*, 687 F.3d 439, 444 (1st Cir. 2012) ("partial success of the investigation did not mean that there was nothing more to be done").   Accordingly, while Defendant argues that "agents had more than substantial evidence to successfully prosecute Wilkins, Chisholm and Chapman," not only does Defendant fail to explain how this was true – especially with respect to Chapman and Chisholm – but Defendant fails to acknowledge that the goals of the investigation went far beyond the prosecution of just Chisholm, Chapman and Wilkins, and those goals (developing sufficient evidence to prosecute suppliers) had yet to be accomplished.

### III.     Final wiretap affidavit (March 23, 2016).

48.     Defendant claims that the as of March 23, 2016, when Judge Saylor signed the final wiretap in this case, the "investigation had essentially come to a close."  Defendant further argues that because investigators had, at that point, "developed sufficient evidence to charge multiple members of the Chapman DTO," investigators lacked necessity to continue the wiretap.  Defendant is mistaken, and his attempts to prematurely end the investigation should be rejected.

49.     As an initial matter, it is clear that with the final wiretap affidavit investigators sought to considerably narrow the focus of the investigation.  The prior wiretap affidavit sought to intercept six individuals, including Wilkins.  The final wiretap sought to intercept only three

individuals, excluding Wilkins.  The Government's narrowing of the case to Chisholm, Chapman

and Mello was deliberate and a result of the professed goals of the investigation.

50.     The affidavit first explained that the wiretap interceptions were the "only

available investigative technique which has a reasonable likelihood of revealing and securing

admissible evidence needed to establish the full scope and nature of the offenses being

investigated."  (¶ 100).  Next, the affidavit acknowledged that investigators had made

considerable progress towards the investigation's goals.  Most critically, investigators had seized

heroin sold by Chisholm and Wilkins.  (¶ 102).  The affidavit also noted that investigators had

developed sufficient evidence to charge Wilkins, Chisholm, Gomes, Hutchings, Davis and Hall.

(¶ 103).  However, the affidavit stated that "investigators have not yet developed sufficient

evidence to charge CHAPMAN himself," and investigators further believed that "additional

evidence is needed to convict persons such as Jason MELLO."  (¶ 103).  Accordingly,

investigators were well-justified in seeking to tap phones of Chapman and Mello, especially

considering the fact that Mello and Chapman were two high-value targets of the investigation.

51.     Notably, Defendant does not dispute that at that time, investigators had

insufficient evidence to charge and convict Chapman and Mello.  Nor could Defendant,

considering that Chapman was not even charged or arrested on April 5, 2016, which was when

the case was "taken down."  Mello was charged, but the basis for that charge was a seizure of

heroin that occurred just days before the April 5th takedown.  Accordingly, while Defendant

asserts that the goals of the investigation had already been accomplished, the facts demonstrate

that this assertion is not credible.

52.     With respect to Chisholm, the affidavit explained that investigators had sufficient

evidence to prosecute Chisholm.  However, as noted above, the investigation still sought

Chisholm's suppliers in New Bedford, and this goal too was still elusive.  Further, the affidavit explained that "interception of CHISHOLM's telephones [was] needed because Chapman frequently 'drops' his telephone.  As such, interceptions of Chisholm's telephones will ensure that investigators are kept apprised of Chapman's movements as well."  (¶ 103).  Simply put, given that Chapman routinely changed telephones, given the constant communications between Chapman and Chisolm, investigators were well-justified in using Chisholm as an "anchor" to ascertain Chapman's whereabouts and to determine where Chapman was obtaining his heroin.

53.     In arguing otherwise, Defendant writes that by this time, investigators had "acquir[ed] sufficient evidence to successfully prosecute" the members of the Chapman DTO.  As noted above, the affidavit specifically acknowledged which defendants could be prosecuted and which could not, and then the application sought permission to wiretap the phones of those who could not be prosecuted.  *See United States v. Rose*, 802 F.3d 114, 119 (1st Cir. 2015) ("central flaw in Rose's argument is that he incorrectly assumes that any 'partial success of the investigation' eliminates the need for further evidence").

54.     Further, Defendant's reliance on *United States v. Cellini*, 2009 WL 2601335 (N.D. Ill. Aug. 21, 2009) to argue, essentially, that the wiretaps must be ended when they have "sufficed to expose the crime."  Defendant contends that the Government was simply trying to obtain additional evidence against the target subjects which was, Defendant suggests, an impermissible goal of the investigation.  However, *Cellini*, in fact, holds that even after a target is subject to effective prosecution, "there is no requirement to cut short an investigation that might well turn up more persuasive evidence and more bad actors."  *Id*. at 5.  Just because *some* evidence was acquired that could sufficiently prosecute a *few members* of the Chapman DTO does not demand that the Government then cease its investigation.  Rather, the goals of the

investigation included prosecuting the entire DTO and its sources of supply, and Defendant

produces not a shred of evidence showing that these goals had been met by March 23, 2016.

Indeed, even as of March 6, 2017 (nearly a year after the case was taken-down), the Government

has not even indicted the New Bedford suppliers.

IV.   The goals of the investigation were not "overly broad" or created for the
      "purpose of manufacturing necessity."

55.   Recognizing the weakness of his argument, Defendant argues that even if

necessity were not fully satisfied by the time of the last wiretap affidavit, the investigative goals

set forth in the affidavit were "overly broad."

56.   As an initial matter, the goals of the wiretap comported with well-settled First

Circuit precedent.  In that regard, the affidavits stressed that the goal of the investigation was to

successfully prosecute and dismantle the Chapman DTO as well as its sources of supply.  These

modest goals have been routinely approved by the First Circuit.  *See, e.g., United States v.*

*Martinez*, 452 F.3d 1, 4 (1st Cir. 2006) (goals of identifying drug suppliers, manner in which

organization transported drugs, how payments were made, storage locations for drugs" were

"discrete and realistic goals for a criminal drug investigation"); *United States v. Santana*, 342

F.3d 60, 65 (1st Cir. 2003) (wiretap was "necessary to uncover the full scope of the conspiracy");

*see also United States v. Rodrigues*, --- F.3d --- (2017), 2017 WL 781481 (1st Cir. Mar. 1, 2017)

(citing with approval *Martinez* and *Santana*); *Cao*, 471 F.3d at 3 (necessity still existed where

the "sources of supply" had yet to be identified.

57.   Defendant relies on *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001) for

the proposition that the goal in that case - "to identify all the participants in this cocaine

trafficking organization and to result in the successful prosecution of these individuals" – was

overly broad.  *Blackmon*, however, is both distinguishable and inapplicable.  In *Blackmon*, the

application for one defendant was "carbon copied" from the wiretap application of another

defendant.  This resulted in material omissions in the affidavit, and a lack of individualized

investigation prior to applying for a wiretap.  When the language duplicated from the other

affidavit was stripped out, the *Blackmon* affidavit contained only boilerplate "lofty goals," which

did not satisfy the necessity requirement.

58.     Defendant maintains that the affidavit was strikingly similar to the one rejected by

the Ninth Circuit in *Blackmon*.  In fact, that is far from accurate. The necessity section in the

affidavits here generally comprised more than 30 pages.  The necessity sections explained in

detail what had happened during the prior period of interception and why the investigation's

goals were not accomplished.  Further, the necessity section described the specific and individual

witnesses and sources, what records had been obtained, and what surveillance had been

conducted.  The necessity sections here were not "boilerplate" as they were in *Blackmon*, but

rather specifically and meticulously crafted to reflect the day-to-day reality of what was

happened on Cape Cod.  Simply put, the affidavits here bore no resemblance to that of

*Blackmon*.

59.     Defendant next attempts to craft a "slippery slope" argument, writing that the

investigators' goals could not be achieved because they were too broad: "had the investigators

discovered the Targets' source of supply, they nonetheless would have needed a wiretap,

according to their logic, to discover that person's source.  So the argument goes; until such time

as the investigators discover the coca grower in Col[o]mbia or the poppy grower in

Afghanistan."  Defendant's argument fails to mirror the true professed goals of the wiretap,

which were much more realistic and limited: "the goal of this investigation is to identify each of

the members of the CHAPMAN DTO/GANG, and to dismantle the CHAPMAN DTO/GANG

through successful arrests and prosecutions of all persons involved in their drug distribution,

including their sources of supply."

60.     Thus, investigators were not trying to reach all the way to mythical farmer in

Afghanistan; instead, investigators were attempting to identify and prosecute the suppliers to the

CHAPMAN DTO that were located in New Bedford, Massachusetts (one hour from Cape Cod).

This goal remained elusive throughout the investigation.  *See, e.g., Martinez*, 452 F.3d at 5 (goals

of identifying drug suppliers were "discrete and realistic goals for a criminal drug investigation

that has legitimately case a wide net").

   **D.  There was sufficient evidence for Judge Dein to conclude that evidence of drug
        trafficking was likely found at Wilkins' residence.**

61.     On March 29, 2016 Magistrate Judge Dein signed a warrant authorizing the

search of 825 W. Main Street, Unit 11, which was the home of Christopher Wilkins.  A 139 page

affidavit was filed in support of all the warrants issued that day by Judge Dein.  The warrant

authorized the search of this residence to find narcotics, firearms, cash, books and records,

correspondence, and cellular telephones.  Although Defendant was primarily a drug dealer, large

cash deposits made by Defendant provided probable cause to believe that Defendant was also

engaged in money laundering, and this offense was listed on the front page of the warrant.

Defendant now argues that there was no evidence connecting his drug trafficking and money

laundering offenses to the target location (his home), and as a result, the evidence recovered by

the warrant must be suppressed.

   I.   Judge Dein correctly concluded that evidence of Defendant's narcotics and
        money laundering activities would be found in his residence.

62.     The First Circuit in *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) set forth

the proper standard of review accorded to a properly issued search warrant:

   A warrant application must demonstrate probable cause to believe that (1) a crime has
   been committed—the "commission" element, and (2) enumerated evidence of the

offense will be found at the place to be searched—the so-called "nexus" element. *See United States v. Zayas–Diaz*, 95 F.3d 105, 111 (1st Cir.1996). With regard to the "nexus" element, the task of a magistrate in determining whether probable cause exists is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In order to establish probable cause, the facts presented to the magistrate need only "warrant a man of reasonable caution" to believe that evidence of a crime will be found. *Texas v. Brow*n, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion). The probable cause standard "does not demand showing that such a belief be correct or more likely true than false." *Id*.  As a reviewing court, we too must examine the affidavit in a practical, commonsense fashion, and we accord "considerable deference" to a magistrate's determination that information in a particular affidavit establishes probable cause.  *Zayas–Diaz*, 95 F.3d at 111 (*quoting United States v. Taylor*, 985 F.2d 3, 6 (1st Cir.), cert. denied, 508 U.S. 944, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993)). Our inquiry is whether the magistrate had a "substantial basis" for concluding that probable cause existed. *Taylor*, 985 F.2d at 5.

63.     The Government does not pretend that there is "automatic" probable cause to search a suspect's residence.  *Feliz*, 182 F.3d at 888.  Instead, "all factors must be weighed in each case in order to assess the reasonableness of inferring that evidence of the crime can be found at the suspect's home."  The *Feliz* Court turned to the question of whether there was probable cause to search a drug dealer's apartment even where none of the drug sales occurred "at or near his apartment."  The Court analyzed whether there was an adequate "nexus" between the residence and the defendant's home.  The Court noted that the "nexus between the objects sought to be seized and the premises searched need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime].  *Id*. at 88.  The Court then cited cases which held that "direct evidence that contraband or evidence indicating drug trafficking is at a suspect's residence is not essential to establish probable cause."

64.     After reviewing the facts presented, the *Feliz* Court concluded that there was probable cause to search the drug dealer's apartment based on the fact that: 1) the defendant was a "long-time, successful drug trafficker" who could have possessed names and telephone numbers of customers and suppliers in the house, 2) it was reasonable to conclude that drug proceeds were stored in the house, and 3) "no other residence or drug-dealing headquarters of his was identified in the affidavit."

65.     Here, the circumstances set forth in detail in the affidavit provided, at the very least, a substantial basis for Judge Dein's conclusion that evidence of the crime can be found at the suspect's home.  In that regard, it is critical to remember here that the evidence gathered by investigators was the result of a long-term wiretap.  This evidence showed that Wilkins consistently and regularly sold narcotics.  The evidence showed that Wilkins possessed multiple cellular telephones and that he used these telephones to sell his narcotics.  The evidence further showed that Wilkins, together with his wife, set-up bank accounts through which he funneled his drug proceeds.  Thus, this was not a simple case where agents had done one or two controlled purchases; rather, this long-term investigation allowed the trained and experienced agent to conclude that evidence of Wilkins' drug dealing and money laundering – narcotics, packaging materials, telephones, paperwork, and bank receipts/records – would be found at his house.

66.     The evidence set forth in the agent's affidavit can be summarized as follows:

a.     The agent, in his training and experience, explained how "evidence of drug crimes can be found in the cell phones and smart phones" of drug dealers, and how "those involved in drug trafficking crimes commonly communicate using multiple cellular telephones."  *See, e.g.*, ¶18.  The agent further described how such telephones are likely to be found at stash houses and residences of drug dealers. ¶21(g).  Notably here, the search warrant affidavit detailed not only

how agents were conducting a wiretap of Wilkins' telephones, but also how Wilkins conducted and arranged many of his drug deal by telephone. On this ground alone, it was proper to search Wilkins' residence to recover the telephones, which were direct evidence of Wilkins' guilt.

b.       Wilkins was described in the affidavit as a long-term "large-scale" everyday drug dealer. At the time of the warrant's execution, "seven controlled purchases of heroin" had been conducted from Wilkins, and these "controlled purchases and wiretap interceptions, combined with large unexplained cash deposits" led investigators to believe that evidence of these crimes, "narcotics, drug proceed and paper and records associated with narcotics trafficking and money laundering" would be found in Wilkins' residence. (¶ 145).  Consistent and regular narcotics trafficking supports the inference that evidence of those crimes would be found in a drug dealer's home. *See, e.g., Feliz*, 182 F.3d at 87; *United States v. Thompson*, 630 F.Supp.2d 138, 143 (D. Mass. 2009); *United States v. Pina*, No. 00-CR-10208 (PBS), 2003 WL 21212735, at *3 (May 21, 2003) ("evidence of long-time trafficking may increase the odds that inculpatory material exists at a dealer's residence because, presumably, such material accumulates over time)

c.       On March 1 and 2, 2016, investigators watched as Wilkins travelled to New Bedford to, investigators believed, collect heroin from a source of supply. Wilkins began and ended his trips at 825 West Main Street, Unit 11, indicating that some evidence of the trip would be found in that location.

d.       On February 27, 2016, charged co-conspirator Benjamin Roderick, a customer of Wilkins, asked for a "Q Tip," which the agent believed to be "drug related" based on the context of the telephone call and due to the fact that Roderick was a drug customer. Investigators then watched as Wilkins drove to his home at 825 West Main Street, briefly went inside, then left and went to Roderick's home. Five minutes later, Wilkins left Roderick's residence and drove back

to 825 West Main Street.  *United States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007) (affidavit was sufficient to support probable cause to search a residence where the affidavit contained information that the defendant sold drugs shortly after leaving the residence, though it contained no direct evidence that the defendant lived in the residence or that he sold drugs out of the residence"); *United States v. Ribeiro*, 397 F.3d 43, 50-51 (1st Cir. 2005) (evidence that the suspect traveled directly from his or her residence to the location of drug transactions); *United States v. Rose*, 914 F.Supp.2d 15, 32 (D. Mass. 2012) (reasonable for reviewing judge to "infer that confirmed drug traffickers such as Rose and Frye would store inculpatory evidence of their drug-trafficking activities, such as cash from drug sales and for drug purchases, customer records and cell phones, in their residences").

  e. The above-mentioned surveillance was coupled with previous surveillance of Wilkins showing that Wilkins kept narcotics at his house.  The affidavit described the delivery of five grams of heroin by Wilkins to Chisholm at 263 Sudbury Lane in Hyannis on January 14, 2016.  (¶ 148).  Although Wilkins subsequently moved to 825 West Main Street, there is no reason why Wilkins would not have continued to store heroin – even small amounts – at his new residence for distribution.

  f. Finally, as detailed in the affidavit (¶149), investigators had already completed a detailed financial work-up of Wilkins' finances, and discovered nearly $150,000 in unexplained cash deposits into Wilkins' accounts.  As such, it was eminently appropriate for the Magistrate Judge to presume that records of financial transactions, tax returns and other documents would be found at the residence.  *Feliz*, 182 F.3d at 88 (noting that large-scale drug traffickers require a "safe yet accessible" place to keep cash and drug related records").

67.     All of this evidence, coupled with the agent's training and experience, permitted Judge Dein a "substantial basis" to conclude that evidence of Defendant's crimes – money laundering and drug trafficking - would be found in his residence.

II.     The agent was not relying solely on his "training and experience" to establish probable cause.

68.     Defendant concedes that in determining whether probable cause exists a magistrate is entitled to accord "some weight" to the officer's "experience and opinions." *Feliz*, 182 F.3d at 87.  However, Defendant argues that here, the only evidence linking 825 W. Main Street to drug trafficking was the expertise of Agent Hayes.  Defendant, however, is wrong.

69.     Although Agent Hayes did include his training and experience in the affidavit in support of his conclusion that evidence of his crimes would be found at Wilkins' home, as described above, Agent Hayes presented a veritable smorgasbord of evidence to support his conclusion.  None of the cases Defendant cites to are of assistance in proving otherwise.

70.     In *United States v. Rosario*, 918 F.Supp.524 (D. R.I. 1996), the defendant sold cocaine on "one occasion to the informant."  The affidavit further listed only "one instance" where Rosario was observed at his residence, and this surveillance did not occur as he left or returned from his drug trafficking.  The Court held such allegations insufficient to permit the search of the residence because it was the opinion of the agent, by itself, which furnished the requisite nexus between the criminal activity and the place to be searched.  Nonetheless, the Court upheld the warrant under the *Leon* "good faith" exception.  This case is nothing like *Rosario*, in that not only was Defendant a long-term everyday drug dealer, but investigators had intercept calls of him transporting drugs to and from his residence.  As stated above, the telephones that Defendant used to arrange drug trafficking were also most likely in his residence.

These phones were in addition to the bank records and deposit slips, all of which are indicative of money laundering.

71.     Defendant also purports to rely on *United States v. Gianelli*, 585 F.Supp.2d 150, 166-67 (D. Mass. 2008).   In *Gianelli* the Court rejected the defendant's argument that evidence of bookmaking crimes would not be found in his residence.  Notably, the Court focused on the nature of the crime – bookmaking – and reasoned that the agent's averment that "bookmakers generally keep records in their home further supports a finding of probable cause in this case." Likewise here, Agent Hayes, who applied for the warrant based on both money laundering and drug trafficking crimes, reasoned that in addition to narcotics, "paper and records associated with narcotics trafficking and money laundering" would be found in Wilkins' residence. Accordingly, *Gianelli* provides support for the agent's conclusion that such records are found in suspects' residences.

III.     The affidavit in no way lends itself to the conclusion that evidence of the target offenses would not be found in 825 West Main Street.

72.     Defendant next argues that the search warrant affidavit affirmatively suggested that Defendant did not store narcotics at 825 West Main Street, and that he instead stored his narcotics at a "stash house."

73.     Defendant writes that the "affiant established that Wilkins stored his narcotics at a stash house, and that he did not conduct deals at his house."  Defendant is presumably referring to the fact that the affidavit states that after Defendant moved out of 263 Sudbury Lane in Hyannis, he continued to use that residence to conduct drug deals.   (¶ 52).  Defendant, in turn, labels 263 Sudbury Lane a drug "stash house."  The existence of the drug "stash house" would, Defendant postulates, lessen the probability that Defendant stored narcotics in his home (825 West Main Street).

74.     However, the affidavit is careful in that it does not describe 263 Sudbury Lane as a drug "stash house."  Instead, as the affidavit describes, this was the "former residence of Christopher Wilkins, and this home now appears to be virtually empty.  As such, investigators are not seeking a search warrant for this residence.  However, as detailed below, despite the fact that Wilkins had moved out, Chisholm continued to use 263 Sudbury Lane as a home in which to conduct narcotics transactions."  (¶ 52).  Accordingly, the affidavit made clear that 263 Sudbury Lane was not a drug stash house; 263 Sudbury Lane was a place Wilkins and Chisholm brought drugs in to order to distribute those drugs on to others.  263 Sudbury Lane was, in effect, a drug distribution residence.

75.     Further, while Defendant did use 43 Erin Lane (home of Bethanne Hutchings) to store some of his drugs, there was no indication from the wiretap calls that Wilkins stored *all* his drugs there.  Rather, there was every indication that Wilkins stored narcotics at multiple locations, including his home and the home of Hutchings.  Indeed, paragraph 147 references a situation where Defendant went directly from his home (825 W. Main Street) to complete a drug deal with Benjamin Roderick.  Once the drug deal was completed, Wilkins returned home, indicating that he brought his drug proceeds with him.  Accordingly, Defendant's use of drug houses to store or distribute narcotics in no way eliminates or lessens the probable cause to search Defendant's primary residence.

IV.     The agent executed the search warrant in "good faith" reliance on Judge Dein's warrant.

76.     Finally, even were this Court to conclude that probable cause to search Wilkins' home was lacking, the search in this case falls well within the parameters of the so-called "good faith" exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (holding that objectively reasonable reliance on a subsequently

invalidated search warrant does not justify exclusion of evidence obtained pursuant to that warrant).  In that regard, the warrant in this case was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See id.* at 923.

77.     Here, the affidavit set forth in significant detail Defendant's involvement in long-term, large-scale drug trafficking.  The affidavit further detailed how he committed drug trafficking crimes at both his current and former homes, and how evidence of such long-term trafficking, which was largely conducted via telephone, would likely be found in Defendant's current residence.  Clearly, the agent was well-entitled to conclude that the affidavit and warrant were signed in "good faith" and therefore are not subject to the exclusionary rule.


                            Respectfully submitted,


                            WILLIAM D. WEINREB
                            ACTING UNITED STATES ATTORNEY


                    By:     /s/Eric S. Rosen
                            ERIC S. ROSEN
                            ASSISTANT UNITED STATES ATTORNEY
                            617/748-3412


                    **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

                            /s/Eric S. Rosen
                            Eric S. Rosen
                            Assistant United States Attorney


Date: March 6, 2017